# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
October 25, 2012 Session

## ROLANDO TOYOS v. AMANDA G. HAMMOCK

**Direct Appeal from the Juvenile Court for Shelby County**
**No. R-2729      Curtis S. Person, Jr., Judge**

---

**No. W2011-01649-COA-R3-JV - Filed January 17, 2013**

---

After primary residential parent Mother notified Father of her intent to relocate, Father opposed relocation and he petitioned to be named the child's primary residential parent. The trial court determined the Father had demonstrated a material change in circumstances, but it found the child's best interests would be promoted by Mother remaining the primary residential parent, and it allowed Mother's relocation with the child. We affirm in part and we reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Kay Farese Turner, Emily L. Hamm, Memphis, Tennessee, for the appellant, Rolando Toyos

Christine W. Stephens, Memphis, Tennessee, for the appellee, Amanda G. Hammock

## OPINION

### I. FACTS & PROCEDURAL HISTORY

On May 5, 2005, a daughter, "E.T.", was born to Amanda G. Hammock ("Mother") and Rolando Toyos ("Father"), who never married. On May 19, 2005, Father filed a "Petition to Establish Paternity" in the Shelby County Juvenile Court. A subsequent DNA test confirmed his paternity, and on November 15, 2005, Father petitioned the court for visitation with the child.

On August 31, 2006, Juvenile Court Magistrate[1] Dan H. Michael entered "Findings and Recommendations of [Magistrate,]" which, among other things, awarded custody of the child to Mother and permitted Father to visit with the child on alternating weekends, certain holidays, and specified weeks during the summer. The findings and recommendations were confirmed as the decree of the juvenile court.

Following mediation, the parties entered into a "Consent Order" on December 11, 2007, which, among other things, named Mother as the child's primary residential parent–awarding Mother 275 days per year with the child and awarding Father 90 days per year with the child. Specifically, the Consent Order granted Father visitation with the child on alternating weekends, certain holidays, two weeks in both June and July, and each Wednesday night except in June and July. Among other things, the Consent Order required Father, an opthalmologist, to pay $2,500.00 per month in child support, to pay certain K-12 and college education expenses, to "maintain reasonable health and dental insurance" for the child, and to "insure his life in the minimum amount of $1,000,000.00 by whole life or term insurance[.]" The Consent Order further provided that all major decisions concerning the child would be made jointly, and that disagreements with, or modifications to, the Consent Order must be submitted to mediation.

On or about January 19, 2010,[2] Mother sent Father a certified letter stating her intent to relocate from Memphis to Rockvale, Tennessee, in Rutherford County based upon her pregnancy by, and her plan to wed, her fiancé "within [the] next two months." Thereafter, on January 26, 2010, Father filed a "Petition in Opposition to Mother's Stated Intent to Relocate with Minor Child to Rockvale, Rutherford County, Tennessee and for Modification of Consent Order." In his petition, Father claimed that "during the last year and a half,

---

[1]In 2009, the title "referee" was substituted with the title "magistrate." *See* **Tenn. Code Ann. § 37-1-107**.

[2]The letter is dated January 15, 20[10], while the postage label is dated January 19, 2010.

Father has had defacto substantially equal time with the minor child and has participated in the minor child's activities in school and otherwise[,]" and thus, he claimed, that a presumption favoring relocation should not arise. Alternatively, he argued that Mother's relocation had no reasonable purpose and that it would pose a threat of specific and serious harm to the child that outweighed the threat of harm to the child of a change of custody, and therefore, that Mother's relocation request should be denied. Father argued that if Mother was allowed to relocate, Father should be named the child's primary residential parent, as relocation was not in her best interest. As relevant to his petition for modification, Father alleged the following material and substantial changes of circumstance: 1) Mother's neglect of the child's educational needs; 2) Mother's false allegations of sexual abuse of the child;[3] 3) Mother's history of making false claims of sexual abuse; 4) Mother's exposure of the child to numerous boyfriends; 5) Mother's pregnancy by a man living in Rockvale and her desire to relocate there; and 6) Father's substantially equal time with the child. Pursuant to a motion filed by Father, the juvenile court temporarily enjoined Mother from relocating the child from Shelby County pending trial.

In response to Father's petition, Mother likewise requested modifications to the 2007 Consent Order. Specifically, in the event that a decision could not be reached jointly, Mother sought to be designated as the *final* decision maker regarding all major decisions. Mother adamantly denied that Father had exercised substantially equal time with the child, and she alleged that Father did not personally care for the child during his scheduled visitation. To accommodate her requested move, Mother sought to reduce Father's parenting time from 90 days per year to 80 days per year–including a reduction of Father's weekend visitation to one weekend per month and cessation of Father's Wednesday night visitation, but including additional summer visitation for Father.

On April 21, 2010, Father amended his petition. In addition to his previous allegations, Father stated that Mother's relocation had no reasonable purpose because her fiancé is a male nurse who could easily obtain employment in Memphis. Father further alleged that Mother's relocation was vindictive as it was aimed at defeating his parenting rights and he claimed that since announcing her intent to relocate, Mother "has taken steps to reduce Father's parenting time that she had freely given him prior to her stated intent to relocate."

A trial was conducted in the matter over the course of thirteen days between April 29, 2010 and November 10, 2010. On December 17, 2010, Juvenile Court Magistrate Michael

---

[3]Father claimed that "Mother has made false allegations of abuse against others and has caused Father's staff, the nanny hired by Father, and family to incur attorney's fees and expenses to defend against such allegations."

entered "Temporary Findings and Recommendations of Magistrate[,]" ("Temporary Order") which stated in part:

> The Court finds that the parents have not spent substantially equal time with the child. The court finds that the Mother spends substantially more time with the child than the father and that the reason for her proposed relocation is reasonable and in the child's best interest. The Court finds no merit in the Father's claim that the Mother's purpose is vindictive, or that there is a threat of specific and serious harm that outweighs the threat of harm to the child of a change of custody. The Court finds that the child's educational needs can be met in the Mother's home of choice and that no severe emotional detriment to the child would result if she is allowed to relocate with her Mother. The Court hereby dismisses the Father's plea to obtain custody based on the Mother's desire to relocate, lifts the temporary injunction against the Mother and allows the Mother to relocate with the child immediately.
>
> In addition, the Court finds that the Mother's declaration of her intent to relocate with the child approximately four hours from this jurisdiction creates a material and substantial change of circumstances that merits the Court's consideration of existing orders. But, notwithstanding Father's success in proving a substantial and material change of circumstances all of his other claims lack merit. In fact the majority of his claims are incredible. The court finds that a change of custody would create more harm to the child than simply modifying the underlying order to reflect the change of circumstances presented by Mother's relocation. This Court finds that it is in the best interest of the child that she remain in the primary custody of her mother.

Thus, the juvenile court lifted the injunction preventing Mother's relocation, and it awarded temporary custody of the child to Mother. Father was awarded once-monthly visitation with the child and he was allowed to exercise parenting time within Rutherford County "for no more than five overnights every odd month." The Temporary Order was confirmed as the decree of the juvenile court.

On December 22, 2010, Father moved for permission for interlocutory appeal and for a stay pending appeal. Father argued, among other things, that the court had improperly decided the relocation issue after bifurcation, and without hearing proof on the issue. He further contended that a stay of the Temporary Order was necessary because Mother would neglect the child's educational needs and because his decreased visitation set forth in the Temporary Order would detrimentally affect his relationship with the child. The trial court

-4-

denied Father's motion for interlocutory appeal on February 17, 2011.[4]

On May 31, 2011, Mother's attorneys, Christine W. Stephens and Michelle M. Strocher, filed affidavits of attorney fees. Ms. Stephens recited a $275.00 per hour fee and she stated that Mother "has incurred attorney's fees of $56,986.00 through May 25, 2011" as well as "expenses in the amount of $12,882.94 through May 25, 2011." Ms. Strocher recited an hourly fee of $200.00 per hour, and she stated that Mother "has incurred attorney's fees of $5,890.00 through May 24, 2011." Father moved to strike the attorneys' affidavits contending that "at no time during these proceedings has Mother presented proof on the issue of attorney fees." Father contended that Mother had not alleged, nor was there an averment in either deposition, that the fees incurred were reasonable and necessary or that Mother had no other funds from which to pay the fees. Furthermore, Father contended that "if such affidavits are allowed to remain in the record, Father will have been deprived of his right to cross-examine the evidence[.]" On July 25, 2011, Magistrate Michael granted Father's motion, striking the affidavits from the record.

On July 12, 2011, Juvenile Court Magistrate Michael entered his single-spaced thirty-three page "Findings and Recommendations of Magistrate," which was confirmed as the decree of the juvenile court by Juvenile Court Judge Curtis Person. The court found "The Facts," in relevant part, as follows:

> After the parties failed to reach an agreement through mediation[,] the case came to trial on April 29[th] 2010. The Father begins his case with the allegation that the Mother makes unfounded accusations of sexual abuse/molestation by others in an attempt to damage his reputation. He also claims her allegations damage the reputations of his friends and family. He claims that his daughter's report of being inappropriately touched by the nanny's 12 year old grandson was a lie concocted by the Mother to "*get at me*." It is his foundation to the claim that the Mother makes unfounded accusations on a regular basis. The proof clearly shows that the Father's claims are self-serving and frivolous.
>
> The Mother reported to the Tennessee Department of Children's Services in mid January of 2010, that her daughter E.T. told her and her fiancé[] that the nanny's grandson "Z", age 12, liked to play house/mommy and daddy and that he had touched her on the bottom during that play. The Mother notified the Father via email about her actions. Upon hearing of Mother's report, the Father told the mother of "Z." She is his long time employee, Durenda Camp.

---

[4]It appears that the court denied Father's motion at a February 17, 2011 hearing and that no written order was entered.

Ms. Camp is the daughter of E.T.'s nanny. The incident occurred while E.T. was staying with the nanny in the home of Ms. Camp and "Z."

When Ms. Camp found out about the allegations against her son she sought out a therapist to advise her on how to handle the allegations and the effects they may have on her son. The therapist she chose was a Dr. Kim Clover. Dr. Clover listened to Ms. Camp's concerns then counseled her to wait and see what the investigation revealed. After hearing Ms. Camp's side of the story she then counseled E.T. [Dr. Clover] was called as Father's first witness.

This Court firmly believes Dr. Clover heard Ms. Camp's version of the story as well as her suspicions about and anger at the Mother. Dr. Clover did not report the allegations to the Tennessee Department of Children's Services. Dr. Clover testified that she did not tell the Mother that she had counseled the offender's mother about the allegations.

Dr. Clover also testified that she had no written authorization to see E.T. from either parent. She testified that she assumed she had a parent's permission to treat the child but had no documentation to that effect. She stated that E.T. was brought to her office by Paige Patrick, the Father's girlfriend.[5] Testimony revealed that he checked E.T. out of school early for this appointment and lied to the Mother about it when confronted, Mother found out about Dr. Clover from E.T. She then got a letter from Father's attorney.

The Father told the Mother he wanted to hang out with E.T. that afternoon as his reason for having his girlfriend check her out of school early. When challenged on his lie he stated he didn't tell the Mother because "*my thinking on that was I wanted E.T. to see a specialist without any preliminary brainwashing by her Mother*." The Father took E.T. to two or three appointments with Dr. Clover before telling the Mother.

Dr. Clover stated that Ms. Patrick informed her that they had concerns about E.T. having sexual knowledge and an accusation that E.T. made against her nanny's grandson. Once again she heard from another adult closely associated with the Father about their views of the Mother. At this point Dr. Clover had not talked to either parent, but she testified that she needed to "*check into*" this allegation. It came to light in later testimony that both Ms. Patrick and the

_____

[5]At the November 2011 hearing on attorney fees, Father testified that he is now engaged to another woman.

nanny had challenged E.T. about her allegations. There was also testimony that the child was told that people go to jail for telling lies. E.T.'s counselor at the Child Advocacy Center testified that Ms. Patrick told E.T. that "[*it*] *never happened*."

Prior to E.T. seeing Dr. Clover she was questioned by the nanny and Ms. Patrick. Prior to Dr. Clover seeing the child she talked with Ms. Camp, the mother of the alleged perpetrator and the Father's girlfriend, both who harbor intense animosity towards the Mother. At this point Dr. Clover decides she needs to "check into" these[] allegations even though she has yet to consult either parent.

Dr. Clover's testimony was thrown further into suspicion after her admissions on cross examination. It became clear to this Court that Dr. Clover had an opinion of E.T.'s allegation before she met with E.T. Dr. Clover admitted that she told Ms. Camp that she saw no need in the offender receiving treatment until the investigation was completed by the authorities. She also admitted that she was compelled by the law to report the abuse if she believed it occurred. When challenged on cross, Dr. Clover admitted to forming her opinion of the situation early. In response to Mother's counsel's question, "*Okay, so you believe it was a lie or by law you would have had to report it, correct?*" [s]he answered, "*correct*." Dr. C[lover] never reported E.T.'s allegations.

In expressing it[]s grave concerns about Dr. Clover's handling of this matter, the Court questioned Dr. Clover as to her ethical obligations in this case. Her response stunned the Court. Dr. Clover stated that "*I think what I was concerned about was the child because it seemed to be a fabricated situation*." She denied that she came to that conclusion after talking to Ms. Camp and Ms. Patrick, but it is clear to this court that her opinion was negatively influenced by these two adults.

This Court is convinced that Dr. Clover's intentions were misplaced. Her testimony and demeanor leads this Court to believe that her opinion of this incident was compromised by her meeting with the offender's mother and the Father's girlfriend and the Father. It is clear to this Court that E.T.'s behavior was influenced by the nanny, Ms. Patrick and the Father.

In considering Dr. Clover's testimony in conjunction with that of the Father, Ms. Paige Patrick, Ms. Camp, documented evidence and all other proof, the Court finds her opinion to be unduly influenced by information she gathered

prior to talking to the child. Further this Court finds her opinion in this matter seriously flawed and hereby grants the Mother's motion and strikes her testimony from the record as incredible and prejudicial.[6]

Because of jurisdictional issues, the allegation of inappropriate touching was closed without any final resolution. The alleged offender lives in Mississippi while E.T. lives in Tennessee. The jurisdictions failed to communicate and the allegations went no further. The Court finds the statement by E.T. to the investigators at the Memphis Child Advocacy Center to be clear and devoid of any coaching. This Court believes that E.T. is telling the truth and that "Z," the nanny's grandson[,] touched her bottom.

The Father who dismissed his daughter's allegation as a lie taught to her by her Mother insists this allegation shows a pattern of unfounded accusations of sexual abuse by the Mother. His witnesses parrot his perspective in their testimony. The Father contends that the Mother makes these allegations when she doesn't get her way. He sees it as an attempt to get at him personally. As proof he offered testimony and documents.

His first witness as to the Mother's use of false allegations come from the nanny, Terri Colon. Ms. Colon talked honestly about her relationship with the Mother and admitted to becoming her friend. Evidence was provided that the Mother was very fond of Ms. Colon and that Ms. Colon considered E.T. her "7[th] grandchild." Ms. Colon also raised serious concerns about E.T.'s acting out sexually. . . .

Ms. Colon was genuinely frustrated by E.T.'s actions, but at a loss as to what to do about them. . . . She then stated with certainty that she did not know where the behavior came from but that it did not come from the Father. E.T. sometimes stayed with her at her home with her daughter, Ms. Camp, and her grandson "Z." Although E.T. reported that she told her nanny when "Z" touched her, the nanny denied this.

_____

[6]In a footnote in his brief to this Court, Father argues that the trial court acted inconsistently when, at trial, it denied Mother's motion *ore tenus* to strike Dr. Clover's testimony, but then struck the testimony in its Findings and Recommendations. At trial, Magistrate Michael indicated that he would not rule on Mother's motion to strike until he had "heard the proof from both sides." Mid-testimony, he stated that he believed striking Dr. Clover's testimony would be "reversible error[,]" and he indicated that he must "listen to her testimony and give it the credibility [he] think[s] it deserves." We find no inconsistency between the trial court's statements and its actions.

Ms. Colon also testified that she saw emails where the Mother accused the Father and his girlfriends of sexually abusing E.T. and concluded that E.T.'s accusations about her grandson were a deliberate ruse perpetrated by the Mother because she wanted to move. She stated on the record that the Mother is no longer a friend. She was very upset at the Mother.

It is clear that Ms. Colon was pained to have to testify in this matter and that she loves E.T. as her "*7ᵗʰ grandchild*." She is also convinced her friend, the Mother, betrayed her. . . . Her pain and anger, supported by her daughter's anger, supported by the Father's anger, supported by Ms. Patrick's anger, was palpable to this Court. She no longer speaks to the Mother unless circumstances force her to do so.

Although the Court finds absolutely no blame in Ms. Colon's actions, it gives no credence to her claim that E.T.'s allegation against her grandson was a lie perpetrated by the Mother. The Court does not find a pattern of intentionally destructive behavior by the Mother. The Court grants little weight to her angry email to the Mother after the allegations came to light.

The nanny's daughter, "Z's" mother, is the Father's long time employee, Durenda Camp. . . . It was clear that Ms. Camp is very angry at the Mother. . . .

[Durenda Camp's] anger is understandable given E.T.'s allegations against her son. But it is clear to the Court that her anger influenced her testimony and compromises her credibility. Ms. Camp has worked for the Father of E.T. for eight years. She was his employee when he and Mother broke up. She remained an employee through all of the previous protracted litigation between the Father and the Mother. Her mother is the child's nanny and also an employee of the Father. Ms. Camp is squarely in the Father's camp and firmly believes that E.T. was told to lie about her son's actions to get at the Father.

Having considered the demeanor and testimony of Ms. Camp, documented evidence and the testimony of all witnesses, the Court gives her testimony little weight. The Court finds that her anger clouds her judgment and that she is loyal to a fault to the Father. The Court does not find her testimony dispositive as to any pattern of behavior by the Mother concerning false accusations of sexual abuse. This Court finds Ms. Camp's testimony incredible.

Paige Patrick testified next. Ms. Patrick and the Father have been in a

relationship for about two years. . . . Ms. Patrick stated that she and the Mother were friendly but not friends. She stated that that all changed in January of 2010, when "*I turned into a monster in her eyes. . . .*"

. . . .

Ms. Patrick went on to say that she had read emails where the Mother had accused the Father's former girlfriend of sexually abusing E.T. and one that accused the Father's father of being at risk to molest E.T. When asked about her position that the Mother accused the Father's father of having the potential to abuse E.T., Ms. Patrick testified that, "*I think the truth is that she knew the trip to visit E.T.'s grandfather was planned and the day they were leaving she didn't get her way about something and made the accusation that his father might do that.*" This opinion exists in the face of uncontroverted testimony from the Father that his father was extremely violent, beating the Father when he was a child, perpetrating violence on the Father's mother and brother eventually forcing the three of them to flee the home permanently.

Like Ms. Camp and Ms. Colon, Ms. Patrick is angry at the Mother. Her anger clouds her judgment and makes her testimony suspect. She is convinced the Mother is a horrible person and that she needed to testify to "*clear her name*," despite the fact that no evidence exists that the Mother accused her of anything. Ms. Patrick repeatedly makes the point that she doesn't enter into discussions between the Mother and the Father when it concerns E.T. But she goes on to testify to things the Father has told her about what the Mother said or what the Mother put in an email. She[,] like[] the Father's other witnesses' testimony[,] repeats almost verbatim their statements.

Having considered her demeanor and testimony at trial, all documented evidence and testimony of all the witnesses[,] this Court finds Ms. Patrick's testimony incredible as to any pattern of behavior by the Mother concerning false accusations of sexual abuse. The Court also questions her allegiance to the truth. Like Father's other witnesses[,] her perceptions are clouded by anger and her relationship with the Father.

The Father testified next. He stated that he knew immediately that the allegation E.T. made against the nanny's grandson was "*fabricated*."

. . . .

-10-

At one point in trial the Father claimed that E.T. said that her mother made her lie. In a follow-up question "*Did you hear her say that*?" Father responded "*correct*." When asked what she said exactly, Father stated "*That Z didn't do anything to me; that her mommy made her lie*." Considering his demeanor and credibility at that time, the Court noted his answer to be incredible.

The only conclusions the court can draw from the Father's insistence that he has been accused of molesting his daughter is that he is so angry with the Mother that he is willing to go to extremes to sway this Court. There is absolutely no proof in the record that the Mother ever made such allegations against anyone nor that she told her daughter to lie about the incident with the nanny's grandson.

Having considered the Father's testimony and demeanor at trial, the Court finds his actions and testimony incredible, frivolous and reckless. There is no proof as to any pattern of behavior by the Mother concerning false accusations of sexual abuse or molestation.

But the proof is clear that E.T. was inappropriately touched by "Z." Her Father claims to be the primary means of support for E.T. but when she discloses "Z"'s actions he simply doesn't believe her. He then surrounds her with adults, her nanny and his girlfriend, who question her about the allegations, tell her it didn't happen [and] that liars go to jail.

The Father's next allegation is that the Mother is "*emotionally dependant and is not capable of adequately parenting the child in the absence of the support systems currently in place in the Father's home and such support system is not available at the proposed relocation site*." Father argues that he provides primary parenting for the child every other weekend and on Wednesday nights. He provides the child with a nanny and he has a reliable girlfriend to help out. He also has long term employees that are willing to help if need be. Given much of the testimony and evidence at this point in the trial, it was clear to this Court that the Father is prone to parent by proxy.

The Father testified that he controlled his calendar, that he sets his own work rules and the he owns his own business. But because he is busy he has his girlfriend transport E.T. to her first dental appointment, and does not tell the Mother. When he unilaterally determines that his child has been coached to tell a very serious lie about her nanny's grandson, he has his girlfriend take the child to see a therapist, without telling the Mother.

He provides a nanny to transport the child to school and pick her up from school on the majority of the days it falls to him. He also has his girlfriend perform this function on occasion. . . .

The Father fails to attend any of the child's events at Grace Saint Luke's pre-kindergarten, instead he sends a proxy. E.T.'s teacher at Grace Saint Luke's does not know him. He did not attend either of the two parent teacher conferences at Grace Saint Luke's. The proof did show that E.T.'s Mother was fully involved at Grace Saint Luke's.

The Father's behavior only marginally improved once E.T. got to St. Mary's. He still failed to attend many events there and he even offered to send a proxy to a parent teacher conference when his work conflicted with the meeting. He did go when his offer was denied. He missed E.T.'s graduation, but he sent the nanny.

. . . .

Father contends that Mother is emotionally unstable because of her father's actions [in murdering her disabled brother and then committing suicide] and her family's demise. Mother admitted to being depressed by the tragic actions of her father and the loss of her mother but denied ongoing mental health problems. No proof of any ongoing emotional instability as to the Mother exists in the record, other than the Father's claim that it exists.

. . . .

There is no proof in the record that E.T. is malnourished while in the Mother's care. There is no proof that she goes unclothed, although Father takes exception stating at one point that [E.T.'s] clothing was "*very inexpensive clothing that doesn't match and that doesn't present E.T. in a very good light.*" There is no proof that the Mother is totally dependent on the Father for a support system.

Father's allegation that the Mother is "*emotionally dependant and is not capable of adequately parenting the child in the absence of the support systems currently in place in the Father's home and such support system is not available at the proposed relocation site,*" is frivolous and arrogant and it is not in any way supported by the evidence.

Father's next allegation is that "*based on the Mother's conduct over the last year and a half, once out of the jurisdiction, Mother is unlikely to comply with any new visitation arrangement or to provide the minor child with food, clothing, medical care, education, and other necessary care*[]." Like the preceding allegations, this one is also baseless. There is no evidence in the record to support this claim. The evidence is clear that the Mother will do what is necessary to promote a continued relationship with the Father. On the other hand[,] the Father at one point asked that her parenting time be supervised.

Father then attacks the Mother's morals. . . .

In an earnest attempt to determine which is blacker, the pot or the kettle, the Court considers these claims. At one point in his testimony the Father made it clear that he didn't know what went on over at the Mother's house. Then he proceeds to allege that the Mother has boyfriends in and out of the home when the child is present. Nowhere in his testimony does he deny that he has had several girlfriends since he and the mother broke up. Nowhere in his testimony does he deny having his girlfriends sleep over when the child was present. The proof shows that the Father frequently uses his girlfriends to help parent E.T. by providing transportation to school and doctor's offices as well as attending school functions.

What is clear from the record is that the mother did have several boyfriends after her relationship with the Father. But she did not allow those men into her home nor did she always introduce them to E.T. Her first relationship after the CONSENT ORDER from December of 2007 was with a dermatologist. He never met E.T. during their 7 month relationship. He was never in her home. Her next relationship was with the CEO of Campbell's Clinic. The relationship lasted about five months and he met E.T. This man never spent the night at the Mother's home but she testified that she spent the night at his home with E.T. one or two times. The next relationship was brief. The Mother testified that the man showed up at her home unannounced and she asked him to leave. He entered her home only once, and then no further than the foyer. He never spent the night in her home and only had brief interactions with E.T.

The Mother then met her current husband, Kenny Dudley and father of her second child. Mr. Dudley did meet E.T. and did spend the night with the Mother while E.T. was in the home. The Father makes the point repeatedly

-13-

that she met her husband on the internet. His implication is that this is an illegitimate venue for establishing a relationship. It is obvious that the Father considers a bar a much more appropriate venue for such things. The Father also challenges the moral sensibilities of exposing E.T. to her out of wedlock pregnancy and the father of this illegitimate child. The Court struggles with his argument.

The Court, in its attempt to distinguish the ever difficult task of discerning the blackness of the pot and kettle makes note that E.T. was born out of wedlock, after her parents met in a bar. There is absolutely no proof that the Mother had men in and out of her home or that she exposed her daughter to these men in an attempt to create a bond or for any other nefarious reasoning. There is proof, on the other hand, that the Father did exactly what he has accused the mother of doing.

The Father has maintained at least two long term live-in girlfriends and perhaps two short term sleep over girlfriends. If he worries about his child's bonds with the Mother's [boy]friends he utterly fails to give the same or greater concern to his child's bonds with Rebecca who lived with him for a year and a half and Paige who has spent at least 70% of her time in his home for the last two years. The Mother married the father of her second child. Father and his girlfriend are as yet still girlfriend[ and boyfriend]. His allegations lack any relationship to the truth. As to these allegations, the pot is in fact blacker than the kettle.

The Father next avers that the CONSENT AGREEMENT requires that E.T. attend an all-girl[]s school. In fact what the CONSENT AGREEMENT actually says is . . . "*Father shall pay for one hundred percent (100%) of the tuition, fees and books for Child for kindergarten through twelfth grade at an all-girls private school to be agreed upon by the parties . . . .*" Both parties agreed to E.T. attending a private co-ed pre-kindergarten, Grace St. Luke's, during the fall of 2008 and the spring of 2009. The proof shows that it was the father's idea to send the child to Grace St. Luke's. This [] decision is provided for in the CONSENT ORDER. The CONSENT ORDER requires the parties to agree on an all-girl[]s school.

The proof shows that the Father and his girlfriend visited Saint Mary's without informing the Mother of his intent. He then unilaterally enrolled E.T. at St. Mary's without telling the Mother[,] who had paid a non-refundable deposit to Grace St. Luke's for the next year. There was no agreement for St. Mary's.

The Mother capitulated.

The Father goes further in his allegations stating that the Mother has neglected the child's education. He specifically avers that the child missed 38 days of pre-kindergarten at Grace St. Luke's from the fall of 2008 to the spring of 2009. He avers that the child has been tardy 5 times in the fall of 2009 and has amassed 10 days unexcused absences in [the] 2009/2010 school year. He alleges the child had to repeat the pre-kindergarten because of the Mother's neglect.

The Mother contends the child successfully completed Grace St. Luke's and proof of E.T.'s successful completion of the Pre-Kindergarten course of study at Grace St. Luke's[] is in the record. E.T.'s teacher from Grace Saint Luke's testified credibly and supported the Mother[']s position that E.T. succeeded at Grace Saint Luke's. She also testified that it was not unusual to hold back children E.T.'s age because they are so young when they matriculate. The proof in fact shows E.T. attended pre-kindergarten at Saint Mary's primarily because of her age and not because she was unprepared according to Father.

. . . . The Mother took complete responsibility for E.T. missing 38 days of pre-kindergarten. . . . She testified that the Father actually caused the child to miss several days due to his taking her on trips. . . . But she claimed a majority of the missed days. . . . The majority included trips to the Mother's family when her step-father died and then again when her mother died. . . .

. . . . The proof clearly shows [Father] was mailed a narrative from the school that showed the days missed and the days tardy. No proof exists that he did anything about the report at that time. In fact the proof shows he failed to communicate with the school at all and obviously had no interest in being involved in E.T.'s first educational experience. The proof is clear that Mother was intimately involved with E.T. at Grace Saint Luke's. E.T. successfully completed her program and was successful as a student according to her teacher, despite the Father's negligence in being part of her experience.

Father goes on to testify that E.T. has been tardy 5 times at Saint Mary's and amassed 10 unexcused absences. . . . Father did not know the reasons why his daughter missed school and it was obvious from his testimony he did not care. It was the Mother's fault as far as he was concerned and any reason given was contrived.

The Father testified that he had to hire a tutor over the summer to bring E.T. up to speed for her entrance into St. Mary's. . . . He hired Sallie Streeter, a retired school teacher . . . . She spent approximately three hours total tutoring E.T. over a three week period. Father stated he never spoke to the tutor, he stated he went through a[n] intermediary. Father did not tell Mother about the tutor. Father also claims he provided E.T. with a Spanish tutor but [he] could not remember her name. He did not tell Mother about this tutor either.

. . . .

[Ms. Streeter] testified that E.T. was behind on learning her colors, color words, forming letters correctly and that she was writing her name inappropriately; "*I thought for her age.*" . . .

. . . .

Ms. Streeter then insisted that E.T. was five years old when she came for tutoring. She said "I thought she was five." . . .

. . . .

Ms. Streeter tutored E.T. at the level of a five year old child. E.T. was just four. Her testimony on the record was that she thought E.T. was five. She went on to erroneously state that E.T. was four when she entered Grace St. Luke's when she was in fact just three. . . .

The Court having considered the demeanor and credibility of Ms. Streeter, finds her testimony credible. This Court finds that Ms. Streeter was telling the truth when she stated that she was teaching E.T. at the level of a five year old. . . . The Court also finds that Ms. Streeter was expecting more of E.T. than she could give, not because of her absences but because of her age. She was tutoring to a five year old who was only just four.[7]

There is no proof in the record that the Father objected to the child missing the days at the time they were missed, one and one half years ago. He claimed that he talked to the Mother about E.T.'s absences. She testified he never raised the issue. The Court believes the Mother. The Father's testimony on this issue

_____

[7]Father correctly points out that at another point in her testimony, Ms. Streeter correctly recited E.T.'s age.

is highly suspect given his tendency to hyperbole and frivolous allegations. It is the humble opinion of this Court that the Father saw this as a problem only after the Mother advised him of her plans to marry and move. He certainly failed to bring the issue up until now. Father argues that he has been the primary caregiver for the minor child, providing a stable home and continuity of care. Perhaps his responsibilities did not extend to the child's education.

The Mother's testimony on E.T.'s tard[ies] and absences was credible. She accepted full responsibility and blamed no one else. She provided proof when E.T. was sick and credible reasons for her tard[ies]. Overall the Mother's explanations were reasonable and credible. . . .

Next Father argues that "*Over the last twelve (12) months, contrary to the terms set forth in the Consent Parenting Order, Father has been exercising substantially equal parenting time with the minor child, with the consent of Mother, and the minor child has benefitted from Father's additional involvement in her life.*" . . .

. . . .

Father constantly complains that the Mother was easy to get along with until he denied her extra money or some other request. He testified that she would only accommodate changes in his parenting time if he honored her requests. The proof fails to support his complaints. In an email dated December 22nd 2008, Father responds to Mother's request to work out a parenting schedule for 2009 and tells her "*we had a good year, and I hope we can continue this tradition.*"

Father's testimony on cross about the discrepancies in his calendar goes directly to his credibility. On direct he spewed off the number of days he spent with E.T. without any supporting detail or original proof. His calendar was a compilation of various other calendars and his memory. Having considered his testimony on direct and cross, the evidence presented and the witnesses, this Court finds his testimony as to the number of days he spent with E.T. and his claim that he had shared substantially equal time with the Mother to be incredible.

The Father testified that during the period of this litigation he has told E.T. on more than one occasion that she was not leaving Memphis and that she was staying at Saint Mary's. His testimony was bolstered by statements E.T. made

to her Mother that she was not going to live with her Mother in Rockvale.  He testified that he told his daughter this because she needed stability.  The Mother testified that she does not talk about these things with E.T.  The Court believes her.

Mother's first witness was Dawn Inman.  She testified as to her experience at Saint Mary's and her knowledge of E.T. and her Mother.  Her testimony was supportive of the Mother.  Considering her demeanor and credulity at trial[,] the Court found her testimony credible.

Next, Mother presented Melinda Williams, a friend.  The Mother and E.T. lived with Ms. Williams briefly after the Mother lost her condominium.  The court found her testimony credible after considering her demeanor and statements at trial.  She bolstered the Mother's case by clearly showing the Court that the Mother is not neglectful or unable to parent E.T. without the Father's "*support systems.*"  She testified that E.T. told her that "*Daddy won't be there; I'll end up being with Terri* [the nanny]; *I won't be with my daddy.*"

The Mother's next witness was Margaret Comes.  She was E.T.'s teacher at Grace Saint Luke's.  Having considered her demeanor and statement at trial the Court finds her testimony credible. . . . She testified that the "*main basis for the pre-kindergarten children is social emotional skill and we don't, per se, fail them, you know, because they don't know their letters and numbers. For me I based it upon whether I feel like they're ready socially and emotionally.*"  When asked how E.T. did as far as developing those skills[,] Ms. Comes said she did fine.

She clearly proved that the Father had little or no meaningful contact with E.T.'s schooling during her stint in pre-kindergarten.  She also proved that E.T. succeeded in the program despite her absences and tard[ies]. . . . She went on to confirm that E.T.'s Mother was intimately involved in her education . . . .

When asked why she would recommend if E.T. move ahead or stay in pre-kindergarten she testified that, "*we just felt like she was not ready to move on to junior kindergarten socially, emotionally, cognitively being with that late, late birthday; that it would behoove her to have another year of pre-kindergarten.*" . . .

. . . .

The Mother's next witness was Jennifer Coffey, a licensed clinical social worker and therapist at the Memphis Child Advocacy Center. Ms. Coffey's testimony was credible and the Court recognized her as an expert in her field. Ms. Coffey treated E.T. after she disclosed the inappropriate touching by "Z." She testified that E.T. was forthcoming and not lying. She also testified that "*the child gave no indication that she had been coerced.*" . . .

. . . .

It is certainly unfortunate that this young child was subjected to the events that resulted in a forensic interview and counseling. In addition[,] she suffered at the hands of the Father's girlfriend telling this four year old child it never happened and that people that tell lies go to jail. The Court understands the nanny's reaction and Z's mother's reaction, but for the Father to take the position that this was all a ruse perpetrated by Mother to get at him is disturbing.

It happened. It was not as serious as many of the things that occur to children every day and E.T. was not traumatized by the event, but it happened. E.T. told the truth, and to her credit she stuck with it despite her Father, his girlfriend and others.

E.T.'s Father used this simple truth in an attempt to destroy Mother.

The Mother's next witness was her friend Sarah Beth Cohen. Considering Ms. Cohen's demeanor and testimony the Court found her to be credible. Her testimony was that of a friend. She testified that the Mother's doesn't talk bad about the Father, in fact she doesn't talk about him much at all. She testified that E.T. is sometimes fussy when she has to go to her Father's for a visit but that mother always encourages E.T. to go by telling her she will have fun. Her testimony credibly negates all of Father's accusations that this Mother is neglectful.

Cherlander Hunt, from the Tennessee Department of Children['s] Services testified next. Her demeanor and testimony at trial was credible. Ms. Hunt personally watched the forensic interview with E.T. at the Memphis Child Advocacy Center. She confirmed E.T.'s statement that "Z" touched her inappropriately.

Kenny Dudley testified next. He is the Mother's husband, E.T.'s stepfather

-19-

and the father of . . . E.T.'s half brother. Having considered his testimony and demeanor at trial the Court finds his testimony credible. . . . From the testimony he gave on both direct and cross he is clearly an appropriate adult to be a part of E.T.'s extended family.

When asked what he would do if the Court did not allow the move, he stated that "*I'll do whatever the Court orders, but I'll also do what's necessary to keep the family together, if that's move, whatever.*" He went on to testify that he had searched for jobs in the Memphis area. . . .

. . . . He did not have any job offers in Memphis at the time of his testimony. He does not have the ability to pay off his home and start over in Memphis without a job.

. . . .

. . . . He went on to say that the Mother portrays the Father as a "*very caring father.*"

It is clear from Mr. Dudley's testimony that he has done everything he can do to try to find a job in his field of work here in Memphis. It is also clear from his testimony that he is concerned over the prospects of selling his home. . . . It is also clear to the Court that there is no animosity o[r] anger directed at the Father for his position in this matter from Mr. Dudley. The Court believes him to be credible and honest.

Next, Mother testified. Her demeanor and testimony at trial clearly shows her to be credible and honest. Her testimony was not tinged with the anger that arose from the Father, his girlfriend, the nanny and his employee. She expressed being hurt by the allegations leveled at her by the Father and proceeded to refute them all.

Father insisted that she could not keep a job. She was only fired from one job and that, by the Father.[8] All of her other jobs were by choice. She testified about the Father's parenting time and disputed that he spent substantially equal time with E.T. She testified to switching days with the Father when his work got in the way. It is clear from her testimony that she worked with the Father

---

[8]Mother testified that Father terminated her employment with his clinic the day after she told him of her pregnancy.

for him to make up [time] he lost to work.

. . . .

[Mother's] testimony made it clear to this Court that the Father does not follow the CONSENT ORDER when it comes to joint decision making. The evidence at trial is that he makes important decisions concerning his child without any input f[ro]m the Mother. He sent her to a dentist with his girlfriend, he sent her to a therapist with his girlfriend, he and his girlfriend toured Saint Mary's. He hired tutors, he enrolled her in extra curricular activities, all without notice to the Mother.

[Mother's] testimony clearly shows that the Father was not involved at all in E.T.'s time at Grace St. Luke's and [he] is only marginally involved at Saint Mary's. . . .

[Mother] also described the anger that is displayed by the nanny since E.T. made the allegation against the nanny's grandson. The nanny does not talk to the Mother now, this even though she is responsible for the child when the parents swap parenting time. Mother testified that the nanny can't interact with her. If the Mother tells her something she simply doesn't respond. When the Mother saw her at a school function and said hello, the nanny ignored her. E.T. is now 5. She surely knows there is something wrong.

It is clear that the Father does not participate in his daughter's medical care. . . .

Mother testified that "*regardless of our personal history, he's E.T.'s daddy. That's her DNA. My daddy was my world and for her to know her father is the most important thing in having a relationship with him.*" She went on to say that she would continue to work with the Father to make sure that relationship was protected. Her testimony was very credible.

The Mother also testified as to her and her husband's attempts to figure out what to do in the face of an adverse decision by this Court. She stated directly that they would try to sell his home in Rockvale and make a home here. She supported her husband's testimony that he was unable to find work here at the same level of his present job. It is clear from her testimony that she has considered the alternatives.

-21-

On cross, the Father failed to disavow this Court of its opinion as to the Mother's honesty and credibility.

In the next section entitled "The Facts and the Law[,]" the trial court further stated, in relevant part, as follows:

. . . . It is clear to this Court the Father is not credible. It is also clear that he has surrounded himself with employees and a girlfriend that join in his outrage at the Mother. The anger in their testimony was palpable. That anger clouded their judgment and may continue to do so until today.

His one expert was poisoned by that anger, destroying her credibility with the Court. Many of the things he accused the Mother of doing he was actually guilty of perpetrating[,] not her. Father pleads that Mother does not parent the child, when he does so by proxy. He claims she impedes the child's education but he is the one who actually ignores it, only paying lip service and the bill. He insists she [is] vindictive but it is he who refuses to communicate. Father pleas they share joint decision making b[ut] he makes decisions unilaterally.

The court then found the following material changes of circumstance: 1) Father's "anger at the Mother and the effect he has had on the members of his support system[;]" 2) Mother's remarriage, having given birth to a child and her desire to move more than 100 miles from Memphis to join her new husband in his home; and 3) Father's lack of educational involvement, his parenting by proxy, and his ignoring the Consent Order by making unilateral decisions regarding E.T.

The court then employed a best interest analysis, discussing the relevant factors set forth in Tennessee Code Annotated section 36-6-106. The court determined that it was in the child's best interest for Mother to remain the primary residential parent.

Having resolved the custody issue, the court then considered Mother's request to relocate. The court noted

Father argues that the Court did not allow the issue of the Mother's move to be addressed at trial. He is right that the Court did not hold a separate hearing on the move but the facts presented at trial made such a hearing redundant. First, the Father's credibility is seriously in question. Any testimony he offers against the Mother's move is highly suspect. The Court in fact prevented the Mother from moving at his request until the trial ended because his unfounded allegations raised such serious concerns for the Court.

The court determined that Father did not spend substantially equal time with the child, stating that "Saying it, does not make it so and it is clear that the Father will fabricate the truth." It further determined that Father had failed to offer any evidence that Mother's move lacked a reasonable purpose, or that the move would "pose a threat of specific and serous harm to the child that outweighs the threat of harm to the child of a change of custody[.]" Furthermore, it found that the evidence clearly demonstrated that Mother's relocation was not vindictive or intended to interfere with Father's visitation rights. Thus, the court concluded that it was in the child's best interest to allow Mother's relocation.

Finally, the court stated that the material changes in circumstance necessitated modifications to the Consent Order. The court then "str[uck] in total the language of the CONSENT ORDER" and substituted its own "Findings and Recommendations," some of which mirrored the Consent Order, some of which did not. The order stated that "Father shall pay reasonable attorney fees to the Mother *to be determined at a separate hearing.*" The "Findings and Recommendations of the Magistrate" were confirmed as the decree of juvenile court by Juvenile Court Judge Person on July 12, 2011.

A hearing on attorney fees was scheduled for July 21, 2011, but Father objected to the hearing, claiming that Mother's counsel had not "provided to counsel for Father an affidavit of attorney fees, an itemized billing statement, or information regarding an expert witness whom Wife intended to testify." The trial court continued the hearing to August 4, 2011, granting Father "reasonable time to review the documentation underlying Mother's assertion of her reasonable attorney fees and suit expenses." In an attempt to finalize the judgment, the court certified the judgment pursuant to Tennessee Rule of Civil Procedure 54.02, although the attorney fee issue had not been resolved. Father filed his Notice of Appeal on July 26, 2011.

On August 29, 2011, this Court entered a per curiam opinion finding that we lacked jurisdiction in the matter because the trial court's order failed to adjudicate Mother's request for attorney fees and because the Consent Order, which was not stamped "filed" by the trial court clerk, did not comply with Tennessee Rule of Civil Procedure 58. The clerical error to the Consent Order was subsequently corrected and the record to this Court supplemented.

According to Magistrate Michael's September 7, 2011 "Findings and Recommendations," on August 4, 2011, the attorneys appeared for the scheduled fee hearing, but the hearing was continued "due to a scheduling conflict with the Court, and both attorneys appearing that day to advise a hearing was not necessary at that time due to settlement negotiations by the parties . . . [such that] the attorneys desired to continue such negotiations until such time that a hearing was needed." Apparently, on September 1, 2011, Mother's attorney was notified via letter that the fee issue had been set for a hearing on

September 2, 2011. Not until the beginning of the September 2 hearing did Mother's counsel provide her billing statements and affidavit. Thus, on September 7, 2011, Magistrate Michael found it appropriate to grant Father's "Motion Ore Tenus to Deny Mother's Award of Attorney Fees" due to her late-submitted information. That same day, Magistrate Michael's "Findings and Recommendations" were confirmed as a decree of the juvenile court by Juvenile Court Judge Person.

Also on September 7, 2011, Mother's counsel filed a request for a hearing before Juvenile Court Judge Person. Father, however, filed a "Motion to Strike Mother's Request for Hearing Before the Judge" arguing that once the findings were confirmed by the juvenile court judge, Mother could no longer seek a hearing. Alternatively, Father argued that because no initial hearing took place, Mother could not seek a "*re*hearing." Juvenile Court Special Judge Herbert J. Lane[9] denied Father's "Motion to Strike," and on November 17, 2011, he entered an order granting Mother $40,000.00 of her requested $69,336.75 in attorney fees, as well as her full request of $13,683.17 in expenses, finding:

> Mother's attorney's fees and expenses were reasonable and necessary in defending the Father's Petition to Modify Custody and to Oppose Mother's Relocation, and in representing Mother in her Petition to Modify the Consent Order dated December 11, 2007. The Court also finds that the Mother's attorney's fees and expenses were customary and within [the] range of rates charged by local attorneys in similar actions.

The court required Father to post a $53,683.17 bond to secure Mother's judgment.[10] Following requests from both parties for additional time in which to file briefs, as well as various post-trial motions, oral argument was heard before this Court on October 25, 2012.

## II.  ISSUES PRESENTED

Father presents the following issues for review, as summarized:

1.   Whether the trial court erred in finding that Mother should remain the primary residential parent;

---

[9]The record states that "The Judge finds it necessary to be absent from holding Court, and . . . appoints as substitute judge, Herbert J. Lane . . . ."

[10]Father subsequently filed a motion to waive the bond requirement, which Judge Lane denied.

2.      Whether the trial court erred in ruling on the relocation issue;

3.      Whether the trial court erred in striking the Consent Order and then in reinstating, sometimes altered, portions thereof;

4.      Whether the trial court erred in allowing a hearing on Mother's attorney fees; and

5.      Whether the trial court erred in its award of attorney fees and expenses to Mother.

For the following reasons, we affirm in part and we reverse in part and we remand for further proceedings.

## III.   STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2011)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* "Trial courts are vested with wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.   DISCUSSION

### *A. Primary Residential Parent*[11]

Because Father argues that the trial court erred in declining to name him primary residential parent, and therefore, that resolution of the relocation issue should have been rendered moot, we first address custody. Again, the trial court found that material changes in circumstance had occurred since entry of the Consent Order: 1) Father's "anger at the Mother and the effect he has had on the members of his support system[;]" 2) Mother's remarriage, having given birth to a child and her desire to move more than 100 miles from Memphis to join her new husband in his home; and 3) Father's lack of educational involvement, his parenting by proxy, and his ignoring the Consent Order by making unilateral decisions regarding E.T. However, it determined that it was in the child's best interest for Mother to remain the primary residential parent.

"A custody decision, once final is *res judicata* upon the facts in existence or reasonably foreseeable when the decision was made[.]" ***Scofield v. Scofield***, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007) (citing *Young v. Smith*, 193 Tenn. 480, 246 S.W.2d 93, 95 (Tenn. 1952); *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001); *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998); *Long v. Long*, 488 S.W.2d 729, 731-32 (Tenn. Ct. App. 1972)). However, because children's and parents' circumstances change, our courts are "empowered to alter custody arrangements when intervening circumstances require modifications." ***Id.*** (citing Tenn. Code Ann. § 36-6-101(a)(1); *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995)).

Modification of an existing custody or visitation arrangement involves a two-step analysis. ***See Boyer v. Heimermann***, 238 S.W.3d 249, 255 (Tenn. Ct. App. 2007). First, the parent attempting to modify the existing custody or visitation arrangement must prove that a material change in circumstances has occurred. ***See Taylor v. McKinnie***, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002)). "[N]ot all changes in the circumstances of the parties and the child warrant a change in custody." ***Cosner v. Cosner***, No. E2007-02031-COA-R3-CV, 2008 WL 3892024, at *4 (Tenn. Ct. App. Aug.22, 2008). "There are no hard and fast rules for when there has been a change of circumstances sufficient to justify a change in custody." ***Id.*** (citing *Cranston v. Combs*, 106 S.W.3d 641,

---

[11]We note that our resolution of the disputes concerning the testimony offered at trial has been significantly made more difficult due to the lack of citations to the record in Mother's brief. Mother has often cited to the trial court's Findings and Recommendations rather than to witness testimony ostensibly supporting such findings. Given the size of the record on appeal, Mother's failure to provide sufficient citations is particularly troubling. Moreover, Mother's brief contains no table of authorities as required by Tennessee Rule of Appellate Procedure 27(2).

644 (Tenn. 2003)). The decision turns on the facts of each case. *Scofield*, 2007 WL 624351, at *4. However, to determine whether a material change in circumstance has occurred, the court should consider whether: "(1) the change occurred after the entry of the order sought to be modified; (2) the changed circumstances were not reasonably anticipated when the underlying decree was entered, and (3) the change is one that affects the child's well-being in a meaningful way." *Cosner,* 2008 WL 3892024, at *4 (citing *Cranston,* 106 S.W.3d at 644; *Kendrick,* 90 S.W.3d at 570; *Blair v. Badenhope,* 77 S.W.3d 137 (Tenn. 2002)). "The presence of the word 'material' indicates that the change must be significant." *Patterson v. Patterson,* No. W1999-01544-COA-R3-CV, 2000 WL 33774558, at *3 (citing Black's Law Dictionary 991 (7th ed.1999)). "If the person seeking the change of custody cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not re-examine the comparative fitness of the parents, *Caudill v. Foley,* 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a 'best interests of the child' analysis. Rather, in the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody." *Oliver v. Oliver,* No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr.26, 2004) (citing *Hoalcraft v. Smithson,* 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999)). However, if a material change in circumstances is demonstrated, the court must then consider whether a modification in custody is in the child's best interest. *See Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003).

On appeal, Father concedes that Mother's remarriage, having given birth to a child and her desire to move more than 100 miles constitutes a material change in circumstances. However, he disputes that the other material changes in circumstance found by the trial court are supported by the record and that such changes constitute material changes. Additionally, he contends that the trial court erred in *not* finding that E.T.'s poor school attendance while in Mother's care constituted a material change in circumstances.

Regarding his involvement in the child's life, Father states that "the proof was uncontroverted that Father encourages education, travel, and new experiences for [E.T.]" He concedes that he is unable to attend "all events and conferences at [E.T.'s] schools due to his work schedule and obligations" as an opthalmologist, but he contends that it was foreseeable when the Consent Order was entered that he would be required to work long hours and that he "would not be able to be personally present for all of [E.T.'s] events and would have to rely on a support system at times to assist him in caring for his daughter."

Concerning the trial court's finding that he ignored the Consent Order–which required joint decision making–by unilaterally making decisions regarding the child, he claims that

the trial court "ignored testimony by Mother regarding how Father had consulted her regarding [E.T.'s] school choices . . . as well as regarding medical appointments." Moreover, he claims that the trial court "ignored uncontroverted proof that Mother had made decisions relative to [E.T.'s] welfare without consulting Father."

Father further claims that "there is no evidence that any anger the Trial Court perceived Father felt toward Mother and the effect he has had on the members of his support system had resulted in any negative effect on [E.T.]."

In her brief to this Court, Mother argues, without much elaboration, that Father has failed to demonstrate that the material changes in circumstance alleged are changes which would affect the child's well-being in a meaningful way. *See Cosner,* 2008 WL 3892024, at *4 (citations omitted). She states, without citation to the record, that the child "has been doing well and thriving and the Mother has been the primary residential parent with the Father primarily having weekend visitation and one overnight visitation during the week." Mother states, without citation to authority, that "while a move in and of itself is not a basis for a modification of custody, it can be a basis for a modification of a previous order regarding parenting time."

Although Mother did not specifically use the phrase "material change in circumstances," in her response to Father's petition she alleged various ways that Father had failed to comply with the Consent Order and she requested that certain modifications be made to it, including its visitation provisions. *See Connors v. Lawson*, No. E2011-00757-COA-R3-CV, 2012 WL 1744400, at *9 (Tenn. Ct. App. May 16, 2012) (citing Tenn. Code Ann. § 36-6-101(a)(2)(B)-(C)) ("[T]he parent attempting to modify the existing custody *or visitation arrangement* must prove that a material change in circumstances has occurred.") (emphasis added). In *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at *7 (Tenn. Ct. App. Aug. 29, 2006), a parent similarly argued to the trial court that a custody order should be modified, then on appeal, claimed that there was no basis for modifying the original order. The Court explained:

> Parties cannot make arguments on appeal that are inconsistent with the arguments they made in the trial court. Thus, having contended in the trial court that there has been a material change in circumstance sufficient to trigger a judicial reevaluation of the [original] child custody and visitation order, Mr. Krupp is judicially estopped from denying the existence of a material change in circumstance on appeal. *In re Austin S.*, No. M2005-01839-COA-R3-JV, 2006 WL 770455, at *2 (Tenn. Ct. App. Mar. 24, 2006) (No Tenn. R. App. P. 11 application filed); *see also Marcus v. Marcus*, 993 S.W.2d 596, 602

(Tenn. 1999); *Webber v. Webber*, 109 S.W.3d 357, 359 (Tenn. Ct. App. 2003)

*Id.* In another case, we refused to consider a parent's argument on appeal that no material change in circumstance had occurred, when he admitted in his answer that circumstances had changed since the entry of the original decree. *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 (Tenn. Ct. App. Aug. 18, 2006). In any event, we find sufficient evidence in the record to support the trial court's determination that a material change in circumstance had occurred since the entry of the Consent Order.

When the Consent Order was entered in 2007, both parties apparently were single and living in Memphis. Pursuant to the Consent Order, Mother was named the child's primary residential parent and she was awarded 275 days per year with the child, while Father was awarded 90 days per year with the child. Father was allowed to exercise his visitation on the first, third and fifth weekends of each month, every Wednesday night, two weeks during both June and July, and specific holidays.

Since entry of the Consent Order, Mother has remarried, given birth to a child, and sought to relocate a significant distance from Memphis. Additionally, despite Father's arguments otherwise, the evidence demonstrates that numerous unilateral decisions were made by Father contrary to the Consent Order which required joint decision making. Father admitted that he hired a tutor for E.T. without informing Mother, and that he had checked E.T. out of school, lied to Mother about the reason for doing so, and had her seen by a therapist without Mother's knowledge. He testified that his "thinking on that was I wanted [E.T.] to see a specialist without any preliminary brainwashing by her mother." Mother testified that Father and his girlfriend toured St. Mary's and began the application process without informing Mother. Mother was initially upset by his actions, but she took E.T. for her evaluation and, after touring the school, was "very happy" with it. However, as pointed out in Father's brief, the previous year, Mother and Father *did* jointly enroll E.T. in Grace St. Luke's. Additionally, Mother testified that Father did not consult her before he enrolled E.T. in extracurricular activities such as piano and tennis lessons, and he had his girlfriend take E.T. to the dentist without Mother's prior knowledge.[12]

---

[12]In his brief to this Court, Father states that "the Trial Court further ignored uncontroverted proof that Mother had made decisions relative to [E.T.'s] welfare without consulting Father." As a purported authority for this statement, Father cites an e-mail sent from Mother to Father which notified Father of E.T.'s allegation against "Z" and in which Mother asked Father if E.T. had made similar allegations to him, his girlfriends, or his employees. Mother did state that E.T.'s statements had been reported to DCS, and that an interview had been scheduled, but Mother assured Father that she would "keep [him] informed of

(continued...)

Father correctly points out that the trial court found that he "encourages travel and new experiences for his child[.]" Thus, he contends that the trial court erred in determining that he parents primarily by proxy. Moreover, he contends that his inability to be present for *all* of E.T.'s events was reasonably foreseeable when the Consent Order was entered.

The evidence presented at trial indicates that Father's nanny, Terri Colon, retrieved E.T. from school on Father's visitation days. Dawn Inman, a mother of E.T.'s classmate at St. Mary's, testified that Mother attended all school parties with the exception of one, while Father only attended a single function. Father did, however, send Ms. Colon to three to four school events and to two birthday parties. Similarly, E.T.'s 2008-2009 Pre-Kindergarten teacher at Grace St. Luke's, Margaret Comes, testified that Mother attended E.T.'s school functions and she came to school "just about every day." However, Ms. Comes stated that she does not even know Father who only came to school "once or twice." She stated that Father had either a babysitter or a girlfriend bring E.T. to school once a week. Mother testified that Father failed to attend a scheduled parent/teacher conference; however, Father claimed that he missed a conference due to his performing an emergency eye surgery. Mother also claimed that Father traveled extensively, that he did not always reschedule his parenting time, and that E.T. would "c[o]me back and sa[y] she stayed with Terri or Paige or something; that she didn't see him[.]" Moreover, Father was unable to name E.T.'s pediatrician, and Mother was not aware of Father ever accompanying his daughter there. Mother's former co-worker, Melinda Williams, testified that E.T. complains about leaving Mother's home to visit with Father. According to Ms. Williams, "[E.T.] always says, but Daddy won't be there; I'll end up being with Terri; I won't be with Daddy."

Father however testified that during the 2009-2010 school year, when E.T. was enrolled in Pre-Kindergarten at St. Mary's, he participated in more than ten school activities including "the potting of plants, the Easter egg hunt, [and] going to lunches." He testified that he controls his schedule and that as E.T. has gotten older he has reduced the number of clinics he owns "so [he] has more free time and more control." He stated that he has his clinic employee Durenda Camp block off his schedule to accommodate E.T.'s activities and that he "clear[ed his] schedule" when E.T. visited. Similarly, his nanny, Ms. Camp, testified that Father helps E.T. with her schoolwork, the two exercise together, and he takes E.T. to the ballet and to the opera, and Ms. Camp testified that if Father has E.T. on his "clinic day" that he will have her brought to the eye clinic so that "he can see her and spend sometime [sic] with her."

---

[12](...continued)
everything." We conclude that Mother's conduct in contacting DCS and then notifying Father prior to the DCS interview does not constitute unilateral action in violation of the Consent Order.

Again, the trial court found that Father's "anger at the Mother and the effect he has had on the members of his support system" constituted a material change in circumstances, while Father contends that there is no evidence that this perceived anger negatively affected E.T. While no direct proof of the effects upon E.T. may have been offered, evidence of anger towards Mother certainly was. Ms. Colon testified that she no longer considers Mother her friend. Email communications between Mother and Ms. Colon were introduced at trial. In response to Mother's email to Father, Father's girlfriend, and Ms. Colon stating that peanut products are not allowed on campus, Ms. Colon responded as follows:

> please take me off ur list. everything I need to know will come from [E.T.'s] dad! you have gone beyond repair with your hatefulness in trying to ruin lives. I know that everything [E.T.] is doing has come from you and your lifestyle. how could u twoface people like you are doing and hurting your daughter in return? [sic] I never thought u would turn on the people u say u love so much! this is what everyone warned me about. I hope you can live with yourself. Poor [E.T.]!! I love her so much!!

Mother testified to negativity which could have been perceived by E.T. Mother stated, "[Ms. Colon] can't interact - - she can't put aside her emotional feelings what she feels I accused her grandson of doing with [E.T.] or she can't even speak to me, like if I said, [E.T.]'s had her dose this morning, she doesn't even say, okay." Additionally, Mother stated that Ms. Colon refused to speak to her at E.T.'s 2010 school birthday party. Similarly, Father's girlfriend, Paige Patrick, testified that she and Mother were nice to one another "up until January of [2010 when she] turned into a monster in [Mother's] eyes[,]" and she testified that she came to court to "clear her name" of Mother's accusations. Like Father, she stated that everything is fine until Mother does not get her way and "then just crazy things happen."

Finally, Father contends that the trial court erred in *not* finding that E.T.'s poor school attendance while in Mother's care constituted a material change in circumstances. The trial court found that E.T. was successful in school and that she had repeated Pre-Kindergarten primarily because of her age. It further found that Mother accepted responsibility for E.T.'s attendance, but it noted that a majority of the absences were incurred due to the deaths of Mother's step-father and Mother. It found that Father had been aware of, but had not timely objected to, E.T.'s absences.

The school records of E.T., who turned three in May 2008, were introduced at trial. E.T.'s Preschool Narrative dated November 7, 2008, reported eight absences in fall 2008. However, the report stated that E.T. speaks in complete sentences and that her "speech is developing." It indicated that E.T. is able to recognize certain letters, shapes and numbers,

as well as her name in print.  She can count and repeat certain Spanish words.

During "Spring 2008-2009,"[13] Grace St. Luke's reported eight absences during the fall; 18 absences during the winter; and 12 absences during the spring.  E.T's Preschool Narrative stated:

> "A regular routine of attending school would help [E.T.] progress in all areas of her development especially in her relationships with her classmates. Frequently, she arrives late which causes her to enter a group of children already playing and disagreements begin as opposed to the days in which she arrives early.  During early arrival, [E.T.] is given the opportunity to create her own play area, which allows others to enter her established setting more pleasantly, her days run much more smoothly when she has arrived at school in a timely manner."

The narrative described problems such as forgetting the discussion topic, speaking with a lisp, confusing pronouns, and needing to be reminded to clean up her area after eating, to use the restroom, or to wash her hands.  However, it described E.T.'s ability to recognize certain numbers, shapes, and letters; to duplicate a pattern; and to count.  It further stated that E.T. is expressive in her play and she interacts well socially.  E.T.'s "Pre-Kindergarten Certificate," indicating completion, appears in the record.  Mother testified that Father received E.T.'s progress reports from Grace St. Luke's which stated the number of absences, but that he did not complain about her attendance until May 2009.

E.T.'s teacher at Grace St. Luke's testified that "the main basis for the pre-kindergarten children is social emotional skill and we don't, per se, fail them, you know, because they don't know their letters and numbers.  For me I base it upon whether I feel like they're ready socially and emotionally."  She stated that in 2008-2009 E.T. "did fine" developing social and emotional skills, but that "[s]he was treated sometimes as . . . just the younger one. . . . probably [due to her] being on the younger end with the May birthday[.]"

During the 2009-2010 school year at St. Mary's, E.T.'s attendance was reported as follows: First Quarter - 5 tardies, 3 absences; Second Quarter - 0 tardies, 2 absences; Third Quarter - 1 tardy, 4 absences.  However, the St. Mary's Handbook was introduced into

---

[13]The narrative is dated May 8, 2009.

evidence and it indicated that 5 excused tardies were allowed during each marking period. With the exception of two categories during the first quarter, E.T. earned the highest rating of "Secure," indicating that she "[u]sually completes the task correctly and independently[.]" She was described as "making consistent academic progress" and as a "strong student academically."

Mother testified that her mother died on December 8, 2008, causing E.T. to miss "at least twenty" days of school for the out-of-town funeral and later to accompany Mother in attending to her mother's affairs. She also testified that during the 2008-2009 school year E.T. missed school due to illness, flight changes during a trip to visit Mother's stepmother and stepsister, Ms. Colon wanting to keep E.T. at Father's home, and trips with Father to Los Angeles and Miami. However, both Ms. Colon and Father's girlfriend, Paige Patrick, testified that on one occasion E.T., at Mother's insistence, had feigned an illness. Ms. Patrick testified that, on another occasion, E.T. told her she had missed school "because her mom said it was too cold outside[;]" however, Father could not recall whether Ms. Patrick's testimony related to a day when E.T.'s school was closed due to inclement weather.

From the foregoing, we conclude that changes occurred after entry of the Consent Order, which were not reasonably anticipated, and which affect E.T.'s well-being in a meaningful way. Specifically, we find that Father's anger and its effect on his support system, Mother's remarriage, having given birth to a child and her desire to move to Rockvale, *see In re Haven T.*, No. E2010-01902-COA-R3-JV, 2012 WL 295685, at *4 (Tenn. Ct. App. Jan. 31, 2012) ("We did not hold [in a prior case] that relocation could never constitute a material change in circumstances."), and his unilateral decision-making constitute material changes in circumstance. Moreover, because the Consent Order contemplated "Father"–as opposed to his girlfriend or nanny–having "responsibility for car[ing] for [the] Child[,]" during his enumerated visitation days, we Father's limited involvement with E.T., likewise, constitutes a material change in circumstances. However, in light of the difficulties Mother experienced during the 2008-2009 school year, E.T.'s since-improved attendance record and her academic success, we reject Father's argument that E.T.'s Pre-Kindergarten attendance record constitutes a material change in circumstances.

Having found a material change in circumstances has occurred since the entry of the Consent Order, we must now consider whether a change in the designation of the primary residential parent from Mother to Father is in the child's best interest, utilizing the relevant factors set forth in Tennessee Code Annotated section 36-6-106.

As stated above, the trial court considered the relevant best interest factors and it determined that Mother should remain the primary residential parent. "Because '[a] determination of a child's best interests must turn on the particular facts of each case[,]' we must review the trial court's findings *de novo* with a presumption of correctness." ***Anthony v. Rodgers***, No. W2002-01240-COA-R3-CV, 2003 WL 22213208, at *4 (Tenn. Ct. App. Sept. 23, 2003) (quoting *Koch*, 874 S.W.2d at 575).

In his "Findings and Recommendations," Magistrate Michael discussed the section 36-6-106 factors as follows:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

It is clear from the testimony that this Mother loves her child and is closely bo[]nded to her and the child to her Mother. It is also clear that the nanny feels great affection for this child. But the child's affection for the nanny is at risk based on the nanny's outright dislike for her Mother. The Court will take the Mother's word that the Father loves and cares for his child, but he failed to assert that devotion in so many words despite having ample opportunity to do so at trial[.]

> (2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

It is clear that the Mother is the primary caregiver to E.T. When she is sick she tends to her needs, when at school she participates, when E.T. needs a doctor [] Mother takes her. When in her Mother's care she is . . . well fed and clothed. Her Mother has always provided E.T. a stable home. The Father attends to E.T. and cloth[e]s and keeps her well fed. He also pays for her education. He has never attended a visit to her pediatrician, in fact to hear him tell it E.T. has never been sick while in his care. He ignored her first year of pre-kindergarten and has only marginally improved and that only since this litigation began. He is not and never has been E.T.'s primary caregiver.

> (3) The importance of continuity in the child's life and the length

-34-

of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

Having her Mother as her primary caregiver since birth is of great importance in considering E.T.'s future continuity and stability. Although she may not see her Father as frequently during the school year if she moves, she will have the opportunity to be with him on a regular basis during the summer months and perhaps the holidays if he chooses to exercise that time. She will also see him every month and if Father so decides he can spend regular intervals with her in Rockvale. Her Mother will no doubt continue to provide E.T. with a stable home and education.

(4) The stability of the family unit of the parents or caregivers;

E.T.'s Mother, Stepfather and younger brother offer a much more stable family life than does the Father. Her stepfather has worked and lived in the area for five years. His only living parent lives nearby. The Father has also worked and lived in the Memphis area for many years but his mother lives on the west coast, his father in Florida and his brother is in the military. Father can provide a stable environment but he must do so through his employees and his girlfriends.

(5) The mental and physical health of the parents or caregivers;

Although Father argued that the Mother was mentally unhealthy[,] his claims were frivolous and unsupported by the facts. Both parent[s] appeared healthy although the Father's anger towards the Mother does concern this Court.

(6) The home, school and community record of the child;

It is obvious that E.T. will get an education. By all accounts she is a bright

child. She will be able to enjoy many of the things she currently has at her disposal in her new home as well as her home here.

> (8)[14] Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

The Court has serious concerns that the environment the Father has created surrounding this litigation could cause emotional damage to E.T. It therefore rules that the Father shall immediately enroll in a course of parent training that will assist him in better understanding his role as a parent.

> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

The Court is also concerned with the attitudes of the Father's girlfriend and the child's nanny. Their anger at trial was palpable. The nanny's attitude towards the Mother is disturbing. The Court finds that the Father shall not allow any person of the opposite sex to reside in his home while E.T. is in his care. In addition, the Father shall within 90 days of th[e] entry of this order either assist the current nanny in obtaining professional counseling to deal with her dislike for the Mother or find an appropriate replacement; and

> (10) Each parent's or caregiver's past and potential for future

---

[14]The court did not discuss the factor related to an older child's preference. *See* **Tenn. Code Ann. § 36-6-106(7)**.

performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

The evidence is clear that the Mother has actively fostered a close relationship between E.T. and her Father. It is also clear she will continue to do so. The proof is clear that the Father fails in this regard. He was secretive and unilateral in his decision-making and at one point in his testimony called for the Mother's time to be supervised. It is the opinion of this Court based on the evidence at trial that the Father has not actively encouraged E.T.'s relationship with her Mother and that he would seek to undermine the same in future.

On appeal, Father argues that "the Trial Court blatantly conflates a relocation best interest analysis with a custody modification best interest analysis, as it repeatedly assumes that E.T. has relocated with Mother, even before the Trial Court had (erroneously) addressed the relocation issue." We agree, in part. The trial court correctly applied the *modification* factors set forth in Tennessee Code Annotated section 36-6-106, as opposed to the *relocation* factors set forth in Tennessee Code Annotated section 36-6-108. However, the trial court did, with regard to three factors, reference E.T.'s best interests upon her presumed relocation to Rockvale. The trial court erred in presuming relocation at that point; however, we will consider whether modification is in E.T.'s best interest without consideration of relocation.

Father argues that naming him primary residential parent is in the child's best interest. He claims that "[t]he Trial Court . . . ignored the substantial proof offered regarding Mother's own bad conduct." He cites Mother's "nonchalance towards [E.T.]'s education" and her failure to provide E.T. with a consistent schedule "which adversely affected [E.T.'s] growth, learning, and maturity." Moreover, he claims that "Mother's conduct in the child's

presence *may have* also influenced [E.T.]'s age-inappropriate behavior."[15] (emphasis added). In contrast, he maintains that he "made great efforts to maintain a regular schedule for [E.T.] and to stress learning and development while [E.T.] was in his care."

Father claims that the trial court merely assumed, without proof of actual harm, that E.T. "could" suffer emotional damage from the perceived anger of Father and his confidants. He again argues that the trial court made unsupported findings that he made unilateral decisions[,] and he claims that the trial court "continued to fault [him] for his work schedule even though such work schedule had existed at the time of the 2007 Consent Order and had even become more flexible since that time."

As discussed above, E.T.'s absences were a result of the choices of *both* parents. Although Mother was primarily responsible for the absences, such occurred during a difficult period in Mother's life, and the program in which E.T. was enrolled was merely *voluntary* Pre-Kindergarten. Moreover, E.T. continued to achieve academically. Mother admits that Father places great focus on academics, while she tends to be more nurturing; however, she too, has purchased academic games and workbooks to supplement E.T.'s learning.

We reject Father's argument that the trial court could not consider his work schedule in a best interest analysis *even if* such schedule was contemplated when the Consent Order was entered. *See Bumpus v. Bumpus*, No. W2007-00395-COA-R3-CV, 2008 WL 763780, at *13 (Tenn. Ct. App. Mar. 25, 2008) ("A trial court can and should make a 'fresh determination' of the children's best interest if it first finds that a material change in circumstances has occurred since the original decree. In doing so, it should not turn a blind eye to facts that were known at the time of the previous decree."). The evidence demonstrated, as the trial court found, that Mother is the more involved parent. She attends E.T's functions while Father usually does not. Father sends a nanny or a girlfriend to E.T.'s functions and to retrieve E.T. from school. Father even exercises his "parenting" time by proxy when he is away on travel.

---

[15]Father cites Ms. Colon's testimony that she observed Mother at a "little family get-together" drinking and dancing and kissing her boyfriend in E.T.'s presence. Previous claims of inappropriate behavior by E.T. include Father's girlfriend's testimony that E.T. would try to "make out" with her and that E.T. had asked her to "lay on top of her[.]" Additionally, the girlfriend testified that E.T. "knows things that a child should not know . . . . [S]he has talked to me before about sex." However, Mother accused Father and his girlfriend of exposing themselves, nude, to [E.T.]–Father, accidentally while urinating. Additionally, she claimed that E.T. had described seeing Father and his girlfriend have sexual intercourse, and Mother assumed they had forgotten to shut or lock a door.

Moreover, the evidence supports the trial court's determination that Father made numerous unilateral decisions regarding E.T.–for example, hiring a tutor, having E.T. seen by a therapist, beginning the application process to St. Mary's, enrolling E.T. in extracurricular activities, and taking her to see a dentist. Additionally, evidence was presented that Ms. Colon refused to speak to Mother in E.T.'s presence.

Overall, we find the evidence supports the trial court's conclusion that a modification of the primary residential parent is not in E.T.'s best interest. The evidence at trial indicated that both Mother and Father love E.T. However, testimony was elicited that E.T. complains when she is required to visit Father. Both parents are capable of providing for E.T.'s basic and educational needs, but Mother has been her primary caregiver, while Father often relies upon others. Father, alone, testified that Mother is unstable. To the contrary, Mother acknowledged the tremendous pain of losing her mother, but in an email to Father, she declared that she would "not allow the loss to compromise [her] child's life."[16]

The trial court found that Father exhibited anger towards the Mother, and we find the evidence does not preponderate against this finding. Father testified that he is unsure of Mother's love for E.T., he questioned her mental stability, and he worried about her exercising unsupervised visitation with E.T. He claimed that any time Mother did not get her way, she would accuse his girlfriends of exposing themselves to E.T. or accuse him of having sex in front of E.T. However, at least with regard to Father, Mother claimed that the alleged exposure was innocent. Additionally, she assumed that E.T.'s descriptions of seeing Father and his girlfriend having sexual intercourse simply stemmed from Father's forgetting to shut or lock a door.

Father stated that Mother accused his father of being a molester when he refused to give her money. Mother acknowledged refusing to allow Father's father to babysit E.T. alone, but she denied labeling him a "molester." Father conceded that his father was abusive, stating "[H]e was physically abusive to my mother and he was fairly abusive with my brother and I . . . . And my mom made the decision that we needed to get far away from him."

When Mother contacted Father regarding the allegations E.T. made against "Z,"

_____

[16]In his reply brief, Father argues that the trial court ignored evidence that Mother had reported a history of depression and ADD to the Memphis Child Advocacy Center, and that she had reported a history of domestic violence between her stepfather and her mother. We find both an ADD diagnosis and abuse which did not involve Mother irrelevant. Moreover, there is no evidence that Mother's reported depression and prior use of anti-depressant medication renders her unstable or unable to parent.

Father failed to respond to Mother because, as he stated, "I thought it was just another attempt at accusing some body of something that they hadn't done and I knew "Z" hadn't done anything to [E.T.] and it was just another play of [Mother] not getting what she wanted and accusing." Father's girlfriend, Paige Patrick, and Father's nanny, Terri Colon, who frequent Father's home failed to believe E.T.'s allegations. Both testified that E.T. told them that Mother had instructed E.T. to make the allegation against "Z" although nothing had happened. Mother, however, denied coaching E.T.'s statements and a licensed clinical social worker at the Memphis Child Advocacy Center found E.T. "gave no indication that she had been coerced." Instead, her story was made "more credible" because she kept "telling a story, the same story, over and over without faltering with the details."

As discussed above, Ms. Colon exhibits anger towards the Mother, even in front of E.T. Moreover, Father's girlfriend, Paige Patrick, stated that she and Mother were nice to one another "up until January of [2010 when she] turned into a monster in [Mother's] eyes[.]" Ms. Patrick testified that she came to court to "clear her name" of Mother's accusations. Like Father, she stated that everything is fine until Mother does not get her way and "then just crazy things happen." Ms. Patrick stated that if Father was named primary residential parent both she and Father would promote a continued relationship between E.T. and Mother. However, the trial court questioned Ms. Patrick's "allegiance to the truth" based upon her anger towards Mother and her relationship with Father.

Mother has overwhelmingly been the parent willing to foster the other's relationship with E.T. Mother testified to rearranging the parenting schedule on multiple occasions to meet Father's work and travel requirements. She testified regarding the importance of E.T. visiting with Father as follows:

> regardless of our personal history, relational history, he's [E.T.'s] daddy. That's half her DNA. My daddy was my world and for her to know her father is the most important thing in having a relationship with him.

Mother's best friend, Sarah Beth Cohen, similarly testified that Mother is "pretty accommodating" of Father's schedule, and she maintained that she has never heard Mother make derogatory remarks about Father in E.T.'s presence. She stated that when E.T. complains about going to Father's, Mother encourages E.T.'s visit by telling her that she will have fun and that her father loves her. Ms. Cohen testified that Mother does not try to exclude Father from E.T.'s life. Instead, "She always makes sure that [E.T.] knows that there is always going to be Daddy; there's always going to be time for Daddy."

In contrast, Father has attempted to alienate E.T. from Mother, according to Mother, by telling her that Mother's son with Mr. Dudley is not her real brother. Additionally, Mother testified that E.T. told her "That Daddy said she's not going anywhere; not to worry; she's going to be at St. Mary's; she's going to be with him; that Mommy's already moved; that now that Mommy has [her son] she doesn't have as much time for you; that [Mother's son is] not her real brother[.]"

Based upon the evidence presented, and its credibility determinations, the trial court concluded that E.T.'s best interests will be promoted by having Mother remain her primary residential parent. Having reviewed the record presented, and giving due deference to the trial court's credibility determinations–finding no clear evidence to the contrary–we find the evidence fully supports this determination.

### B. Relocation

Tennessee Code Annotated section 36-6-108 provides that "[i]f a parent who is spending intervals of time with a child desires to relocate . . . more than one hundred (100) miles from the other parent within the state," the relocating parent must provide notice to the other parent by registered or certified mail at least sixty days prior to the move, in the absence of court-found exigent circumstances. The notice must contain a statement of intent to move, the location of the proposed new residence, the reasons for the proposed relocation, and a statement that the other parent may oppose relocation within thirty days of notice receipt. **Tenn. Code Ann. § 36-6-108(a)(1)-(4)**.

If the parents spend substantially equal time with the child, no presumption in favor of or against relocation arises. Instead, the court determines whether to allow relocation based upon the best interests of the child, considering the relevant factors set forth in Tennessee Code Annotated section 36-16-108(c)(1)-(11). If, however, the parents do not spend substantially equal time with the child, the parent spending the greater amount of time with the child shall be permitted to relocate unless the court finds the relocation has no reasonable purpose, "relocation would pose a threat of specific and serious harm[17] to the

---

[17]"Specific and serious harm to the child includes, but is not limited to, the following:
(A) If a parent wishes to take a child with a serious medical problem to an area where no adequate treatment is readily available;
(B) If a parent wishes to take a child with specific educational requirements to an area with no adequate education facilities;

(continued...)

child that outweighs the threat of harm to the child of a change of custody[,]" or the parent's motive for relocating is vindictive, in that it is aimed at defeating or interfering with the visitation of the parent spending less time with the child. **Tenn. Code Ann. §36-6-108(d)(1b.)**

As stated above, the trial court determined that Father did not spend substantially equal time with the child. It further determined that Mother's relocation was not vindictive and that Father had failed to offer any evidence that Mother's move lacked a reasonable purpose, or that the move would "pose a threat of specific and serous harm to the child that outweighs the threat of harm to the child of a change of custody[.]" Thus, the court concluded that it was in the child's best interest to allow Mother's relocation.

On appeal, Father argues that the trial court erred in ruling on the Mother's relocation request. Father claims that the relocation issue was bifurcated from the modification issue–which was tried first–and that he was denied an opportunity to be heard regarding relocation. He claims that "the Trial Court heard no proof on the relocation issue, and it sustained multiple objections that evidence relevant only to the relocation issue should not be presented."

Mother does not seem to deny that bifurcation occurred, but she contends that Father was, nonetheless, afforded opportunities to present evidence related to relocation. She claims he was afforded the opportunity to testify regarding "Mother notifying him of her intent to move and the reasons for her move as set out in her Certified Letter dated January 15, 2010 . . . . [as well as] the number of days that he claims he parents E.T." She also claims that he was afforded the opportunity to prove that Mother's move had no reasonable purpose, that

---

[17](...continued)
(C) If a parent wishes to relocate and take up residence with a person with a history of child or domestic abuse or who is currently abusing alcohol or other drugs;
(D) If the child relies on the parent not relocating who provides emotional support, nurturing and development such that removal would result in severe emotional detriment to the child;
(E) If the custodial parent is emotionally disturbed or dependent such that the custodial parent is not capable of adequately parenting the child in the absence of the support systems currently in place in this state, and such support system is not available at the proposed relocation site; or
(F) If the proposed relocation is to a foreign country whose public policy does not normally enforce the visitation of non-custodial parents, that does not have an adequately functioning legal system or that otherwise presents a substantial risk of specific and serious harm to the child."

it would be harmful to E.T., or that it was vindictive. She states that Father's counsel called only Father as a rebuttal witness and that "Father offered nothing further as it related to the issue of Mother's relocation."

Alternatively, Mother argues that if Father was not given ample opportunity to present proof on the relocation issue, that he waived the opportunity to do so. Mother points to Father's counsel's statements at the February 17, 2011 hearing on his motion for permission for interlocutory appeal:

> [Father's counsel]: At the conclusion of the proof on the Petition for Modification, the Court called us into chambers and told us . . . that it was for purposes of scheduling, and, accordingly, the court reporter was not invited to attend such scheduling conference.
>
> I'm sure - - I cannot speak for opposing counsel, but my anticipation was that we would be told to come back for a ruling on the Petition for Modification, and then depending upon that ruling, we would proceed - - either proceed or there would be no need to proceed with the relocation proof.
>
> . . . .
>
> I say this in all due respect to the Court, not in criticism to the court, but what transpired was, when we went into chambers, that the father had sustained his burden of proof in showing that a material and substantial change of circumstances had occurred, but that the Court was going to allow the relocation and allow it immediately upon the recessing of the school term from St. Mary's School to which the child was attending.

In support of her waiver argument, Mother claims that after the in-chamber meeting, Father failed to request a separate hearing on the relocation issue. Furthermore, she cites the following statements of Magistrate Michael at the February 17, 2011 hearing on Father's motion for permission for interlocutory appeal:

> My sense is, and low be it for me to limit proof on [the relocation] issue, that the amount of proof that was presented at trial gave me everything I needed to make that decision.

If you disagree with that, and it's obvious that you do, then I need to reconsider whether or not we need to have a scheduling conference to set it up so you can have your argument on the relocation and posit your objections pending my final order.

. . . .

If counsel wishes to schedule a hearing to posit your objections on the move, I will be glad to have a scheduling conference with you on the record and we'll schedule a hearing. I will tell you this, I will withhold any Final Order pending the proof on that hearing and I will set a time frame on it.

Father's counsel, however, refused such a hearing based upon the trial court's prior decision to allow the move. Thus, Mother's counsel claims a second waiver occurred when Father refused the court's offer for a relocation hearing following its denial of his motion for interlocutory appeal.

This Court has previously considered a similar situation. In *Placencia v. Placencia*, 48 S.W.3d 732, 733 (Tenn. Ct. App. 2000) ("*Placenia II*"), primary residential parent father filed a petition to relocate, and mother petitioned to be named the primary residential parent. After finding a material change in circumstances, the trial court granted mother's petition to be named the primary residential parent. *Id.* However, this decision was reversed on appeal. ***Placencia v. Placencia***, 3 S.W.3d 497 (Tenn. Ct. App. 1999) (*Placencia I*) *perm. app. denied* (Tenn. Sept. 13, 1999).

After the first appeal, mother filed a second petition to modify alleging additional changes in circumstances and seeking a hearing on Father's proposed relocation. *Id.* The trial court, however, denied mother's petition declaring that it "'took into consideration all issues and factors in the Court's original ruling and the Court of appeals has spoken to these issues.'" *Id.* Mother filed a second appeal to this Court. *Id.*

In *Placencia II*, we rejected father's argument that in addressing custody in the trial court, the relocation issue was tried by *implication*. *Id.* at 735. We noted that *only* father's motive had been addressed in *Placencia I*; whether the relocation had a reasonable purpose or would seriously harm the child was not addressed. *Id.* We found that although Tennessee

-44-

Code Annotated section 36-6-108(d) "does not appear to require specific findings as to the three [relocation] elements[,] . . . . given the fundamental nature of the interests involved, . . . the trial court should at least have addressed the issues of 'reasonable purpose' and 'specific and serious harm' in its opinion." *Id.* at 735-36. Importantly, we held that "even if the trial court had addressed all three prongs of the applicable statute," that mother's second petition to modify should nonetheless have been considered as an amendment to her original response to father's petition to relocate because it alleged new facts since the prior proceedings. *Id.* at 736. In sum, we determined that "the issues involved in allowing a custodial parent to relocate with a child are too important to leave to 'implication.'" *Id.* at 735.

In the instant case, the modification and relocation issues were clearly bifurcated, with modification to be heard first and relocation then addressed, if necessary. On at least two occasions, the trial court sustained objections that evidence related to relocation should be reserved. Unlike *Placencia*, the trial court here addressed each of the three relocation issues in its "Findings and Recommendations." It found that the evidence clearly demonstrated that Mother's relocation was not vindictive or intended to interfere with Father's visitation rights; however, it found that Father had *failed to offer any proof* that Mother's move lacked a reasonable purpose or that it would "pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody[.]"

As we stated in *Placencia II*, "Tennessee has long recognized that a parent's right to custody is a fundamental liberty interest which may not be abridged absent due process of law." *Placencia II*, 48 S.W.3d at 734 (citations omitted). Father and his counsel reasonably believed they would be allowed to present relocation-specific evidence at a second hearing. However, due to the trial court's discrediting of Father's testimony and its conclusion that a second hearing would be "redundant[,]" no such hearing ever occurred. In ruling on the relocation issue after limiting the evidence to that concerning modification, the trial court effectively denied Father his day in court. We find no waiver of the relocation issue by Father, as the trial court offered Father the opportunity to schedule a relocation hearing only *after* it had announced its decision to allow Mother's relocation. Accordingly, we vacate the trial court's order permitting Mother to relocate with E.T and we remand the case to the trial court for an evidentiary hearing on the issue of Mother's relocation. E.T. shall be permitted to reside with Mother in Rockvale, Tennessee, pending resolution of the issue on remand.

### C. 2007 Consent Order

Next, we address Father's argument that the trial court erred in striking the Consent Order in total and then in reinstating certain, sometimes altered, provisions thereof. Father

seems to argue that after striking the order, *identical* provisions could not be reinstated without proof thereon and that *modified* provisions could not be ordered because neither party sought such modifications either in their pleadings or at trial. Father groups his objections into three categories: financial matters; decision-making authority, and visitation.

### 1. Financial Matters

In his brief to this Court, Father claims that the trial court erred in modifying and/or reinstating certain financial provisions of the Consent Order: Father's obligations related to the child's K-12 and college educational costs, child support,[18] uncovered medical expenses, health and dental insurance, and life insurance; and Mother's ability to claim E.T. as a dependent for tax purposes.[19]

Because Father's financial obligations may be affected by resolution of the relocation issue, we find these financial issues should be addressed, if desired by the parties, on remand.[20] Thus, we vacate the trial court's "Findings and Recommendations" regarding K-12 and college educational costs, child support, uncovered medical expenses, health and dental insurance, life insurance, and tax deductions. Pending further order of the trial court on remand, we reinstate the Consent Order relative to these provisions.

### 2. Decision-Making Authority

Next, Father challenges certain "decision-making authority" provisions set forth in the

---

[18] Both the 2007 Consent Order and the "Findings and Recommendations" required Father to pay $2,500.00 per month in child support.

[19] Both the 2007 Consent Order and the "Findings and Recommendations" permitted Mother to claim the child for income tax purposes. Father also claims that the trial court erred in awarding Mother her attorney fees. This issue will be addressed in a later section of this opinion.

[20] We recognize that if the trial court denies Mother's relocation request, Father will not automatically become the child's primary residential parent; however, should Mother choose to relocate without the child or should Mother return to Memphis with the child, Father's parenting time could be affected, necessitating a change in his financial obligations.

trial court's "Findings and Recommendations." Specifically, Father challenges the trial court's grant of "sole decision making authority" to Mother "concerning E.T.'s future including but not limited to education, non-emergency medical care, religion and extracurricular activities." Father points out that in her response to Father's petition for modification, Mother requested only that the parties continue to exercise joint decision-making, with Mother having *final* authority in the event of a dispute.

Father also challenges the parenting schedule set forth in the "Findings and Recommendations." He claims that the ordered schedule affords him less parenting time than that obliged by Mother in her response to his petition for modification, but he fails to specify the alleged fewer number of days. Finally, he contends that the trial court erroneously ordered that the exchange of the child should occur at Interstate 40, Exit 170, when Mother agreed to exchange the child forty-four miles closer to Father at Interstate 40, Exit 126.

Like the financial matters, we find that these "decision-making authority" provisions may be affected by the trial court's resolution of the relocation issue. Thus, these provisions should be addressed, if necessary, by the parties on remand. We vacate the trial court's "Findings and Recommendations" regarding Mother's sole decision-making authority, and, pending further order of the trial court, we reinstate the provision set forth in the Consent Order providing for joint decision making authority. Because E.T. is permitted to live with Mother pending resolution of the relocation issue, reinstatement of the Consent Order's parenting schedule is infeasible;[21] thus, the parenting schedule set forth in the "Findings and Recommendations" is to be followed pending further order of the trial court. Finally, because the Consent Order does not speak to an exchange location, E.T.'s exchange shall continue to occur at Interstate 40, Exit 170 pending further order of the trial court.

3. Visitation

Finally, Father challenges certain "visitation" provisions imposed by the trial court:

---

[21]For example, the Consent Order provides that Father shall have overnight visitation each Wednesday night.

ordering Father to enroll in parenting training, ordering Father either to assist his nanny in obtaining professional counseling or to find an appropriate replacement, and prohibiting Father from allowing any person of the opposite sex to reside in his home while E.T. is in his care.

"A trial court has broad discretion to take necessary action in order to 'protect the welfare of [a] child or a party.'" **Curry v. Curry**, No. M2007-02446-COA-R3-CV, 2008 WL 4426895, at *15 (Tenn. Ct. App. Sept. 18, 2008) (quoting Tenn. Code Ann. § 36-6-404(a)(4)(F)). The abuse of discretion standard requires us to consider "(1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." **State ex rel. Vaughn v. Kaatrude**, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000) (citing *BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988)).

a. Parenting Training

Regarding the trial court's requirement that he enroll in parenting training, Father argues that "neither the record nor the Trial Court's own findings support the Trial Court's conclusion that Father did not understand his role as a parent or that any such supposed lack of understanding had caused any harm to [E.T.]" He further contends that there is no evidence that he had interfered with Mother's parenting time, or that he had attempted to "substitute any third person for Mother." In contrast, he claims, "Mother's own witnesses testified to incidents that support a finding that Mother had attempted to alienate [E.T.] from Father."

First, we reject Father's insistence that requiring parenting training is a "restriction upon visitation" which requires a specific finding that *un*restricted visitation would harm the child. **See Eldridge v. Eldridge**, 42 S.W.3d 82, 85 (Tenn. 2001)("The noncustodial parent's visitation 'may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense.'") (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). However, we find the trial court's decision to require Father to attend parenting training is, nonetheless, sufficiently supported by the evidence presented. As stated above, Mother testified that Father has attempted to alienate E.T. from her by telling E.T. that Mother's son with Mr. Dudley is not her real brother. Additionally, Mother testified that E.T. told her "That Daddy said she's not going anywhere; not to worry; she's going to be at St. Mary's; she's going to be with him; that Mommy's

already moved; that now that Mommy has [her son] she doesn't have as much time for you; that [Mother's son is] not her real brother[.]" At trial, Father admitted telling E.T. that "she wasn't going anywhere," although he claimed it was in response to E.T. "crying about leaving[.]"

Although we question the relevancy of Mother's alleged interference with the Father/child relationship to the issue of Father's required parenting training, we will briefly respond to these allegations set forth in Father's brief. Father correctly points out that, according to Mr. Dudley, E.T. sometimes refers to Mr. Dudley as "Big Daddy[.]" However, Father cites no evidence that Mother promoted the use of this title, or that such use alienated E.T. from Father. Father claims that "Father's testimony was replete with examples of how Mother had adversely affected [E.T.'s] enjoyment of activities to which Father had exposed her." However, the cited authority for this statement includes testimony from Mother's former co-worker Melinda Williams who agreed that Father exposed E.T. to ballet and tennis; however, Ms. Williams stated that E.T. did not like tennis and when Father's counsel insinuated that Mother had fostered such dislike, Ms. Williams responded that "[Mother] didn't say a word to [E.T.] about tennis." Father also cites his own testimony in which he alleged that Mother allows E.T. to watch too much television and to eat in front of the television. He stated that E.T. was learning Spanish until he and Mother "had some problems[,]" at which point E.T. no longer wanted him to speak in Spanish or to read to her in Spanish. However, Father conceded that he "[doesn't] know whether [Mother is] supportive or non supportive" of E.T. learning Spanish.

In sum, we find sufficient evidence to support the trial court's requirement that Father attend parenting training.

b. Counseling for Nanny

Next, Father claims that "there is an insufficient evidentiary foundation" to support the trial court's order that Father assist his nanny, Ms. Colon, in obtaining professional counseling "to deal with her dislike for the Mother" or to find an appropriate replacement. We disagree.

At trial, evidence was presented demonstrating Ms. Colon's affection for E.T., which the trial court noted. However, significant evidence of the deteriorated relationship between

Ms. Colon and Mother, following Mother's divulgence of E.T.'s statements regarding abuse by Z, was also presented. As discussed above, Ms. Colon testified that she no longer considers Mother a friend, and an angry email from Ms. Colon to Mother was submitted into evidence. Mother testified that Ms. Colon is no longer able to interact with Mother, and she even refused to speak to Mother at E.T.'s 2010 school birthday party. We find the trial court did not abuse its discretion in ordering Father to obtain counseling for Ms. Colon or to find a suitable replacement.

### c.    Overnight Visitation by Opposite Sex

Finally, Father challenges the trial court's order that "Father shall not allow any person of the opposite sex to reside[22] in his home while E.T. is in his care[,]" apparently based upon its finding that Father's girlfriend, Paige Patrick, harbored anger for Mother.[23] Father argues that in order to prohibit the overnight presence of a paramour, the trial court must make a specific finding that the paramour's presence would harm the child. According to Father, such finding was not made.

Our Supreme Court discussed visitation restrictions based upon the presence of a paramour in *Eldridge v. Eldridge*, 42 S.W.3d 82, (Tenn. 2001). The trial court permitted the mother, who was engaged in a live-in lesbian relationship, unrestricted overnight visitation with the child. *Id.* at 84. However, the eastern section of the Court of Appeals reversed, finding that the trial court abused its discretion in failing to prohibit the child's overnight visitation with the mother while the mother's girlfriend was present. *Id.* at 85. The Court

---

[22]Husband's girlfriend, Paige Patrick, testified that she and Father have "[n]ever lived together[,]" but she acknowledged that she spends the night at his home "a little over half the time[.]" Father seems to interpret the trial court's restriction on members of the opposite sex "resid[ing]" in his home to include overnight visits by Ms. Patrick. As stated above, at the November 2011 hearing on attorney fees, Father testified that he is engaged to another woman. The parties have not supplemented the record with post-trial facts to address whether Father has since married this woman.

[23] The "Findings and Recommendations" state:
The Court is also concerned with the attitudes of the Father's girlfriend and the child's nanny. Their anger at trial was palpable. The nanny's attitude towards the Mother is disturbing. The Court finds that the Father shall not allow any person of the opposite sex to reside in his home while E.T. is in his care. In addition, the Father shall within 90 days of th[e] entry of this order either assist the current nanny in obtaining professional counseling to deal with her dislike for the Mother or find an appropriate replacement[.]

of Appeals then modified the trial court's visitation order by prohibiting the girlfriend's presence during the child's overnight visitation with the mother. *Id.*

On appeal to the Supreme Court, the Court noted that a visitation order is reviewed for an abuse of discretion, *id.*, and it acknowledged that "the noncustodial parent's visitation 'may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense.'" *Id.* (quoting *Suttles*, 748 S.W.2d at 429). However, the Supreme Court found that the Court of Appeals had failed to "identify any legal or factual error by the trial court that might constitute an abuse of discretion." *Id.* Furthermore, the Court of Appeals had failed to demonstrate how its ordered modification would cure any alleged error by the trial court. *Id.* Thus, it reversed the decision of the Court of Appeals. *Id.* at 84.

In the present case, Father's girlfriend of two years, Paige Patrick, stated that she and Mother were nice to one another "up until January of [2010 when she] turned into a monster in [Mother's] eyes[,]" and she testified that she came to court to "clear her name" of Mother's accusations. Like Father, she stated that everything is fine until Mother does not get her way and "then just crazy things happen."

The trial court found that Ms. Patrick is angry at Mother, that both her anger and her relationship with Father cloud her judgment, and the court questioned her allegiance to the truth. The trial court made no finding, however, that allowing Father overnight visitation with E.T. while Ms. Patrick, or another girlfriend, is present would "jeopardize the child, in either a physical or moral sense." Accordingly, we find the trial court's prohibition lacked a sufficient evidentiary foundation and we vacate the provision set forth in the "Findings and Recommendations."

### D. Attorney Fees

#### 1. Allowing Attorney Fee Hearing Before Juvenile Court

Next, we address Father's arguments regarding attorney fees. As set out above, in its "Findings and Recommendations," the trial court reserved the issue of attorney fees. A hearing on attorney fees was subsequently scheduled for July 21, 2011, but Father objected to the hearing, claiming that Mother's counsel had not "provided to counsel for Father an

affidavit of attorney fees, an itemized billing statement, or information regarding an expert witness whom Wife intended to testify." The trial court continued the hearing to August 4, 2011, granting Father "reasonable time to review the documentation underlying Mother's assertion of her reasonable attorney fees and suit expenses."

According to Magistrate Michael's September 7, 2011 "Findings and Recommendations," on August 4, 2011, the attorneys appeared for the scheduled fee hearing, but the hearing was continued "due to a scheduling conflict with the Court, and both attorneys appearing that day to advise a hearing was not necessary at that time due to settlement negotiations by the parties . . . [such that] the attorneys desired to continue such negotiations until such time that a hearing was needed." Apparently, on September 1, 2011, Mother's attorney was notified via letter that the fee issue had been set for a hearing on September 2, 2011.[24] At the beginning of the September 2 hearing, Mother's counsel provided her billing statements and affidavit. Thus, on September 7, 2011, Magistrate Michael found it appropriate to grant Father's "Motion Ore Tenus to Deny Mother's Award of Attorney Fees" due to her late-submitted information. That same day, Magistrate Michael's "Findings and Recommendations" were confirmed as a decree of the juvenile court by Juvenile Court Judge Person.

Also on September 7, 2011, Mother's counsel filed a request for a hearing before Juvenile Court Judge Person. Father, however, filed a "Motion to Strike Mother's Request for Hearing Before the Judge" arguing that once the findings were confirmed by the juvenile court judge, Mother could no longer seek a rehearing. Alternatively, Father argued that because no initial hearing took place, Mother could not seek a "*re*hearing." Juvenile Court Special Judge Lane denied Father's "Motion to Strike," and on November 17, 2011, he entered an order granting Mother $40,000.00 of her requested $69,336.75 in attorney fees, as well as her full request of $13,683.17 in expenses, finding:

> Mother's attorney's fees and expenses were reasonable and necessary in defending the Father's Petition to Modify Custody and to Oppose Mother's Relocation, and in representing Mother in her Petition to Modify the Consent Order dated December 11, 2007. The Court also finds that the Mother's attorney's fees and expenses were customary and within [the] range of rates charged by local attorneys in similar actions.

___

[24]Magistrate Michael's September 7, 2011 "Findings and Recommendations" states that following the August 4, 2011 continuance, "[t]he case was reset for hearing at 1:00 p.m. on Friday, September 2, 2011, after the phone call between the attorneys and the Court, and the letter from Father's attorney dated Thursday, September 1, 2011[,] that advised Mother's attorney the case had been set for Friday, September 2, 2011 at 1:00 p.m."

The court required Father to post a $53,683.17 bond to secure Mother's judgment.

On appeal, Father reasserts the arguments made in his "Motion to Strike." He first contends that once the findings and recommendations of the magistrate become the decree of the juvenile court, a party may no longer request a rehearing before the juvenile judge. He maintains that Mother "waited" for the juvenile court to confirm the Magistrate's granting of Father's "Motion Ore Tenus to Deny Mother's Award of Attorney Fees" before filing her request for a hearing, and therefore, that her right to such hearing was waived. Alternatively, Father contends that Magistrate Michael granted his "Motion Ore Tenus" before the hearing on Mother's request for attorney fees had begun and therefore, that Mother had no right to a *re*hearing.

Tennessee Code Annotated section 37-1-107, regarding juvenile court magistrates, provides:

> (d) Upon the conclusion of the hearing in each case, the magistrate shall transmit to the judge all papers relating to the case, together with the magistrate's findings and recommendations in writing. Any hearing by a magistrate on any preliminary matter is final and not reviewable by the judge of the juvenile court, except on the court's own motion. . . .
>
> (e) Any party may, within five (5) days thereafter, excluding nonjudicial days, file a request with the court for a hearing by the judge of the juvenile court. The judge may, on the judge's own motion, order a rehearing of any matter heard before a magistrate, and shall allow a hearing if a request for such hearing is filed as herein prescribed. Unless the judge orders otherwise, the recommendation of the magistrate shall be the decree of the court pending a rehearing.
>
> (f) In case no hearing before the judge is requested, or when the right to hearing is waived, the findings and recommendations of the magistrate become the decree of the court when confirmed by an order of the judge. . . .

The plain language of Tennessee Code Annotated section 37-1-107(e) provides that a party may request a hearing before the juvenile court within five days of transmittal of the magistrate's findings and recommendations. On September 7, 2011, Magistrate Michael granted Father's "Motion Ore Tenus to Deny Mother's Award of Attorney Fees." That same day, Mother filed a request for a hearing before Juvenile Court Judge Person. We simply find no language in Tennessee Code Annotated section 37-1-107 to support Father's argument that waiver occurs where a hearing is requested within five days, but following

confirmation by the juvenile court. Such a reading would effectively deny a party a hearing where, as here, confirmation occurred within the 5-day filing period.

We likewise reject Father's argument that Mother could not request a hearing before the juvenile court because Magistrate Michael granted Father's motion prior to a full hearing on attorney fees. Tennessee Code Annotated section 37-7-107 provides that a party may request a "hearing" before the juvenile court "[u]pon the conclusion of the hearing in each case[.]" We find that Magistrate Michael's grant of Father's motion concluded the hearing, invoking Mother's right to request a hearing within five days. Accordingly, Juvenile Court Special Judge Lane did not err in denying Father's "Motion to Strike."

## 2. Award of Attorney Fees

In Tennessee, the recovery of attorney fees in custody matters has been authorized by statute for many years. ***Deas v. Deas***, 774 S.W.2d 167, 169 (Tenn. 1989). Tennessee Code Annotated section 36-5-103(c) provides:

> The plaintiff spouse[25] may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or child, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

"There is no absolute right to such fees, but their award in custody and support proceedings is familiar and almost common place." ***Deas***, 774 S.W.2d at 170. Regarding an award of attorney fees under the statute, we have stated:

> There is no exhaustive list of the factors a trial court should take into account in exercising its discretion on the question of attorney's fees. Such an award would seem to be most appropriate, however, where the plaintiff proves that she is entitled to an award for the benefit of her minor child, and where the cost of vindicating that right produces an inequitable reduction in the actual

---

[25]The statute has been interpreted to allow the recovery and/or payment of attorney fees by non-spouses. ***See Jones v. Smith***, No. W2010-01160-COA-R3-CV, 2011 WL 6160239, at *1-2 (Tenn. Ct. App. Dec. 12, 2011) *perm. app. denied* (Tenn. Apr. 20, 2012)

amount the child receives.

*Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. App. 1997). However, "trial courts may award attorney's fees without proof that the requesting party is unable to pay them as long as the award is just and equitable under the facts of the case." *Id.*

"The award of attorneys' fees is within the trial court's discretion." *Huntley v. Huntley*, 61 S.W.3d 329, 341 (Tenn. Ct. App. 2001) (citing *Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. App. 1997)). Therefore, unless it "'affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining,'" we will not reverse the trial court's decision on appeal. *Id.* (quoting *Marcus v. Marcus*, 993 S.W.2d 596, 601 (Tenn. 1999)).

A hearing on the issue of attorney fees was held before Juvenile Court Special Judge Lane on November 15, 2011. As recited above, Judge Lane entered an order, on November 17, 2011, granting Mother $40,000.00 of her requested $69,336.75 in attorney fees, and granting her full request of $13,683.17 in expenses, stating:

> Mother's attorney's fees and expenses were reasonable and necessary in defending the Father's Petition to Modify Custody and to Oppose Mother's Relocation, and in representing Mother in her Petition to Modify the Consent Order dated December 11, 2007. The Court also finds that the Mother's attorney's fees and expenses were customary and within [the] range of rates charged by local attorneys in similar actions.

At the November 2011 hearing on Mother's request for attorney fees, Father testified that he had earned approximately $200,000.00 thus far in 2011 and that he expected to earn approximately $250,000.00 for the year. He also testified regarding various expenses and debts, but on appeal he does not argue that he lacks the ability to pay Mother's fees. Father instead argues that the trial court's award was error because, he claims, "the record is devoid of proof that the cost of litigation had produced an inequitable reduction in the actual amount of support [E.T.] receives or that securing such an award of attorney fees and expenses would ultimately inure to the benefit of [E.T.]."[26] He points to Mother's testimony that she had already paid $70,504 in attorney fees by withdrawing funds from Mr. Dudley's 401k. He

---

[26]Father does not seem to argue that the *amount* of the fee charged was unreasonable.

-55-

also claims that "both parties enjoyed some success in litigating their cross-petitions" and he argues that Mother "initiated this litigation" by requesting to relocate.

At the hearing, Mother testified that she is a full-time stay-at-home mother to E.T. and her then-fifteen month old son. In her appellate brief, she contends that "[i]t is obvious that a thirteen day trial and all the necessary preparation would be costly, and that Mother, a stay-at-home Mom, would not have the ability to pay those fees and expenses and Mother being able to secure an award of fees and expenses would ultimately inure to the benefit of E.T."

Although we have stated that an award of attorney fees "would *seem* to be most appropriate" where the fee-seeking party proves the award would benefit the child and where the absence of a fee award would inequitably reduce the actual support the child receives, *see Richardson*, 969 S.W.2d at 936 (emphasis added), we find no requirement that proof of such is a prerequisite to an award of attorney fees. In any event, we find sufficient evidence to infer that the trial court's award to Mother will inure to E.T.'s benefit. That Mother was able to pay her fees by withdrawing funds from her husband's retirement account does not preclude an award of attorney fees, as, again, "trial courts may award attorney's fees without proof that the requesting party is unable to pay them[.]" *Id.* Father filed his modification petition *after* Mother stated her intent to relocate; however, he testified that he had consulted his attorney regarding filing such a petition *prior to* receiving Mother's relocation notice. Although Father was successful in demonstrating a material change in circumstances, the trial court ultimately denied his petition's request to name him primary residential parent. In sum, we find no abuse of discretion in the trial court's partial award of attorney fees to Mother nor in its full award of litigation expenses to Mother.

3. Appellate Attorney Fees

In the "Conclusion" sections of their respective briefs, both parties request appellate attorney fees. "An award of appellate attorney's fees is a matter within this Court's sound discretion." *Chaffin v. Ellis*, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, his success on appeal, whether he sought the appeal in good faith, and any other equitable factors relevant in a given case. *Id.* (citing *Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005)). In this matter, we find it equitable to decline to award attorney fees to either party on appeal.

### E. Remand

In his brief to this Court, Father makes numerous assertions that Magistrate Michael "ignored" or "disregarded" certain evidence and he further states that Magistrate Michael "vehemently and unnecessarily attacked Father," that he "took every opportunity to vilify Father[,]" and that he made "inappropriate and unnecessary statements . . . [indicating] bias and prejudice against Father." Based upon these allegations, Father asks this Court to remand the issues to judges "other than Honorable Dan Michael or Honorable Herbert Lane."

The preamble to Rule of Professional Conduct 8 directs that "[a] lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold." **Tenn. Sup. Ct. R. 8, Preamble 6**. Father's comments, attributing improper motives to the trial court judges, manifest disrespect for the juvenile court judges involved in this matter and will not be tolerated by this Court.

This Court has not been presented sufficient evidence of bias and prejudice to warrant remand to non-participating judges. However, this issue may be pursued on remand.

### V. CONCLUSION

For the aforementioned reasons, we affirm in part and we reverse in part and we remand for further proceedings. Costs of this appeal are taxed equally to Appellee Amanda G. Hammock and Appellant, Rolando Toyos, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.